846 So.2d 245 (2002)
HOWARD INDUSTRIES, INC., Appellant/Cross-Appellee,
v.
Charles G. ROBINSON, Appellee/Cross-Appellant.
No. 2001-WC-01357-COA.
Court of Appeals of Mississippi.
October 29, 2002.
Rehearing Denied January 21, 2003.
Certiorari Denied May 22, 2003.
*249 Douglas S. Boone, Laurel, attorney for appellant.
Thomas L. Tullos, Bay Springs, attorney for appellee.
Before SOUTHWICK, P.J., BRIDGES, and BRANTLEY, JJ.
SOUTHWICK, P.J., for the court.
¶ 1. The Workers' Compensation Commission awarded benefits to Charles G. Robinson based on both a temporary total disability and on a permanent partial disability. The employer, Howard Industries, Inc., appeals. We reject the arguments that Robinson has no permanent loss of wage earning capacity, that Howard should not be required to continue furnishing medical treatment because of a subsequent intervening injury while under the employ of another company, and that statutory penalties and interest should not have been imposed. We agree, however, that Robinson was not temporarily totally disabled for four years and that setting $75 per week as his permanent loss of wage earning capacity is unsubstantiated. We reverse and remand on those issues. We also remand for fact-findings as to when Robinson should have known that his claim of carpal tunnel syndrome was related to his employment at Howard.

STATEMENT OF THE FACTS
¶ 2. Charles Robinson finished high school in 1975. Two years later he received a certificate in welding technology from Jones County Junior College. Robinson then held various positions including maintenance work, off-shore manual labor, and welding. On June 16, 1992, Robinson went to work for Howard Industries. Robinson's duties initially were to weld the backs on transformers.
¶ 3. Robinson served in this capacity for six months, when he was promoted to crew leader. Robinson's wages increased, as did the job's responsibilities and physical requirements. Robinson now had to push 300 to 1500 pound transformers down a roller bed and, apparently with the assistance of other workers, lift 45 to 150 pound air compartments on rigs to inspect them for leaks. There was medical evidence that Robinson's weight of 130 pounds meant that, without injuries, he should not lift more than 40 to 50 pounds.
¶ 4. On February 16, 1994, Robinson suffered an undisputed on-the-job injury. Robinson was pulling a transformer on a roller bed. He tripped on a piece of stock, fell backwards, and injured his lower back. Robinson was sent by his employer to a clinic where x-rays were taken. Based on their results, Robinson was referred to a bone and joint clinic. There he was examined and ultimately referred to a neurologist, Dr. Marc D'Angelo, who became Robinson's primary physician.
¶ 5. As a result of his back injury, Robinson was unable to work for six months. At that time, Dr. D'Angelo released Robinson to return to work with certain restrictions: he was not to push more than 50 pounds nor to pick up more than 25 pounds. Robinson testified that at Howard he was told that light duty was not available. Therefore, he resumed his previous duties. Robinson held this position *250 for approximately three months when he was moved to internal assembly. His primary duties consisted of welding and pushing coil assemblies that weighed as much as eight hundred pounds on a roller bed. Due to the physical demands of this job, Robinson started experiencing back pains, neck pains, migraine headaches, and tingling sensations in his fingers. Robinson attributed his neck pain to the fact that he was required constantly to flip his welding shield down over his eyes with a whipping motion of his neck because his hands were occupied with other aspects of his job. Robinson earned $9.28 per hour while employed in this capacity.
¶ 6. In June of 1997, Robinson went back to see Dr. D'Angelo. After nearly five months, Dr. D'Angelo released Robinson with the same restrictions as before and one more: Robinson could not weld on a repetitive basis. Dr. D'Angelo recommended that Robinson be given a work assignment in the maintenance department. Robinson was told that there was no position available in maintenance and the only job available was the one he was presently performing. Robinson resigned from Howard in November of 1997, because he was physically unable to continue working in his present position. He was earning an hourly wage of $9.88.
¶ 7. Six months later Robinson became employed by Big B Valve. The physical requirements of this job required Robinson to lift twenty pounds on a occasional basis. Robinson testified that approximately three to four months after he started working for Big B Valve and while turning his head to the left, he heard something "pop in his neck." He passed out. Shortly after this episode, Robinson was laid off. When he was terminated, Robinson had been earning $9 an hour.
¶ 8. There was testimony accepted by the administrative judge that Robinson achieved maximum medical improvement on January 5, 1998. At the time of the hearing, Robinson was employed by L & A Contractors making an hourly wage of $7. This job does not require Robinson to do any heavy lifting and is within the job restrictions placed on Robinson by Dr. D'Angelo.
¶ 9. Robinson filed two workers' compensation claims. On January 23, 1998, he filed a petition to controvert alleging a cervical injury. On February 17, 1998, Howard Industries filed its answer denying that Robinson suffered from a cervical injury. On June 19, 1998, Robinson filed another petition to controvert alleging that he suffered a lower back injury in February 1994. Howard again filed an answer and admitted that the back injury was a compensable event. On July 20, 1999, Robinson amended his petition to controvert alleging carpal tunnel syndrome in the left hand. Howard answered by asserting as an affirmative defense the statute of limitations as well as denying that Robinson's carpal tunnel syndrome was a compensable event.
¶ 10. The administrative judge ordered Howard Industries to provide Robinson with the following:
1. Temporary total benefits in the amount $243.75 per week from February 22, 1994 until May 1, 1997, and in the amount of $270.67 per week from May 1, 1997 until January 5, 1998, with credit for [workers' compensation] sums previously paid by the employer and for sums earned by the claimant during this period:
2. Permanent partial disability benefits in the amount of $75 per week commencing January 5, 1998 for a period of 450 weeks:
3. Furnish such medical, surgical, and other attendance or treatment, nurse and hospital service, medicine, *251 crutches, artificial members, and other apparatus for such period as the nature of the injury or the process of the claimant's recovery from his cervical, lower back and/or left carpal tunnel syndrome injuries may require.
¶ 11. The judge also found that Howard's November 1997 job-offer was not consistent with the physical restrictions defined by Dr. D' Angelo. Robinson's later work for two other companies demonstrated initiative and he retained significant earning capacity. The loss in wage earning capacity was found to be $75 per week.
¶ 12. The Commission on October 12, 2000, adopted and affirmed the administrative judge's ruling with one exception. The Commission accepted that Robinson sustained a permanent loss of wage earning capacity in the amount of $75 a week, but he would not as a result be entitled to that entire amount but only to two-thirds of his lost earning capacity. The new amount of $50 a week in permanent partial disability benefits was awarded. Howard seeks reversal here.

DISCUSSION
¶ 13. The decision of the Commission will be upheld if there is substantial evidence to support it, and it is neither arbitrary nor capricious. Fleming Enter., Inc. v. Henderson, 741 So.2d 309, 314 (Miss.Ct.App.1999). Howard makes several objections to the findings of the Commission, all of which will be judged using this deferential review.
I. Cervical Injury
¶ 14. Howard Industries argues that the Commission committed error by requiring that it compensate Robinson for his alleged cervical injury. A compensable injury is one "arising out of and in the course of employment without regard to fault which results from an untoward event or events, if contributed to or aggravated or accelerated by the employment in a significant manner." Miss.Code Ann. § 71-3-3(b) (Rev.2000). Howard alleges that this injury occurred elsewhere.
¶ 15. Robinson first complained of a neck injury to a physician in June 1997, three years after his back injury. Dr. D'Angelo on a report made note of Robinson's complaint, and stated that the pain was "most likely due to repetitive motion of his neck as he flipped his face shield up and down" during welding. An MRI was done, and no compression of the suspected spinal disc was found. The doctor recommended that he be transferred from positions that required continual welding throughout the day, but a job requiring occasional welding would be acceptable. Such a transfer did not occur. Physical examinations over the next few months continued to find no physical evidence of what was causing the pain. Another doctor who examined Robinson found no specific physical cause of the pain that Robinson identified. It is the absence of objective evidence regarding any physical change to the normal condition of Robinson's neck that allegedly prevents the Commission from finding that a compensable neck injury occurred in 1997. The employer argues that it was "obvious that the Employee exaggerated any claims of pain and the physicians who evaluated and treated Employee could find no injury that would explain these complaints of pain."
¶ 16. To put this in terms of our appellate review standard, Howard's challenge is that the evidence of a cervical injury is insubstantial. There was medical record and affidavit evidence accepting Robinson's complaints, despite the absence of physical evidence, as truthful and reflective of the effects of the work at Howard.
*252 We first address whether there must as a matter of law be some demonstrable physical cause of pain.
¶ 17. Robinson's claim of a disability must be supported by medical findings. Miss.Code Ann. § 71-3-3(i) (Supp. 2001). However, "[c]ompensation may be allowed for disabling pain in the absence of positive medical testimony as to any physical cause whatever." Morris v. Lansdell's Frame Co., 547 So.2d 782, 785 (Miss.1989). If there are "circumstances tending to show malingering," the claim may be rejected, but if "the claimant's testimony as to pain is not inherently improbable, incredible or unreasonable, or ... untrustworthy," it should be accepted. Id. Medical findings of a disability need not be supported by a physician's identification of a specific physical condition causing disabling pain. There was medical evidence that such pain arose from the effects of the work at Howard, and the Commission accepted that evidence. That is enough.
¶ 18. Having found that the quality of the evidence was not suspect, we turn to its quantity. There was an explanation that Robinson had been required to use a "whipping" motion with his neck more than 1,000 times a day while he was an "internal welder." He was unable to use his hands to lower his shield because the nature of his job required his hands to be occupied at all times. Dr. D'Angelo's report of May 8, 1998, stated that "the use of the welding hat precipitated his neck pain...." Dr. Robert Smith, physician for Howard Industries, stated in his deposition that he had encountered this type of problem with welders before. Dr. D'Angelo's restrictions that Robinson could no longer weld on a repetitive basis arose because of the neck pain. Dr. D'Angelo, as primary treating physician, found Robinson's claims of pain to be legitimate. This was substantial evidence of a cervical injury.
II. Temporary Disability, total or partial
¶ 19. The administrative judge found that Robinson was totally disabled from the date of his first injury, which occurred on February 16, 1994, through January 5, 1998. In the terminology of the statute, this was a "temporary total disability." Miss.Code Ann. § 71-3-17(b) (Rev.2000). Howard asserts that this was error since Robinson was gainfully employed during most of this time period.
¶ 20. The Commission seemingly affirmed the administrative judge's order on this point, but used language that qualified that order. The Commission noted Howard's objection that the claimant had worked during long periods of that four years and therefore could not have been totally disabled the entire time. The Commission then interpreted the judge's order to hold that Howard "did not have to pay temporary total disability benefits ... for any period of time from February 16, 1994 and January 5, 1998 during which he worked and earned his regular wages." We do not find that limitation in the administrative judge's order, though as we explain, the judge did provide for a credit. The Commission then concluded that Robinson was entitled to "temporary disability benefits from February 16, 1994 through January 5, 1998 only for those periods of time when he was, because of injury, unable to work and earn his full pay."
¶ 21. Two weeks later, the Commission sent a letter to indicate the benefits that were owed. It showed total disability benefits that would be paid for all four years, subtracted the amounts that had already been paid including wages, and computed the difference. We have to interpret this, despite the Commission's earlier language, that total disability was owed for four years, with credits for wages earned.
*253 Whether that is an acceptable approach is the focus of the discussion that follows.
"Temporary disability, whether total or partial, has reference to the healing period following injury; it begins with the disabling injury and continues until such time as the employee reaches the maximum benefit from medical treatment, or differently expressed, it is a condition which exists until the injured employee is cured or is as far restored as the permanent character of his injuries will permit." Triangle Distributors v. Russell, 268 So.2d 911, 912 (Miss.1972) (emphasis added). Russell holds that the period of temporary disability is not necessarily a period of total disability. Whether total or partial, temporary disability ends when the worker reaches maximum benefit from medical treatment. Id. at 912-13. Retaining substantial wage earning capacity and being returned by a physician to work while the healing process continues constitutes a temporary partial disability, not a total one. While temporarily and partially disabled, the injured worker is entitled to two-thirds of the difference between his average weekly wages before the injury and his earning capacity during the period "in the same or other employment...." Miss.Code Ann. § 71-3-21 (Rev.2000).
¶ 22. The administrative judge in her opinion found Robinson to be totally, not partially, disabled from February 16, 1994, through January 5, 1998, allowing Howard "credit for ... sums earned by the claimant during this period." The problem with this characterization of "total" disability is that Robinson worked for long periods during the four years at Howard, with periods of few complaints, with performance of some duties that may have been beyond his work restrictions, and with some disability throughout. This likely means that there were some periods of total disability during that four years as Robinson was out of the workplace for extensive but not constant periods.
¶ 23. This cannot be four years of total disability. We find error in categorizing it as such. Again, we note that the Commission's language seemed to accept that reality. The Commissioners, though stating that they agreed with the administrative judge, "reiterate here that Mr. Robinson is entitled to temporary disability benefits from February 16, 1994 through January 5, 1998 only for those periods of time when he was, because of injury, unable to work and earn his full pay." They referred to one of their own decisions for a fuller explanation: Hendershot v. Weiser Security Systems, Inc., MWCC 97-08017-G-0280 (May 25, 1999). In that 1999 opinion, the Commission overturned a finding of temporary total disability for the four month period that an employee was back at work. It found that during a period in which the claimant "worked and earned wages," there generally should not be "temporary total disability" benefits. In Hendershot, the administrative judge had credited against the amount that would be paid as benefits the total wages paid the claimant during that same period. We quote the Commission's analysis in Hendershot as to why that was error:
Temporary disability benefits represent a substitute for wages lost by the employee during the period of ... recovery from injury. If the employee is still technically in recovery, but has returned to work and is suffering no loss of wages, then temporary disability benefits are not payable. [citations omitted]
To further refine the point, benefits for temporary total disability are payable when the employee is completely unable to engage in work and is therefore suffering a total, yet temporary, loss of wage earning capacity. Miss. *254 Code Ann. § 71-3-17(b) (Rev.1995). Benefits for temporary partial disability are payable when the employee is able to work, but is not earning full pay and is therefore suffering a partial, yet temporary, decrease in wage earning capacity. Miss.Code Ann. § 71-3-21 (Rev. 1995).
¶ 24. We agree with the Hendershot opinion that an administrative judge does not "net the same result by simply awarding the Claimant temporary total disability benefits during the entire period and allowing the Employer credit for any wages earned by the Claimant during this period." In a case dealing with a different reason for a credit (a company-provided employee disability benefit plan), the Supreme Court found that the employer paid more in its own disability plan than was owed during the first year of the period for workers' compensation benefits. South Central Bell Telephone Co. v. Aden, 474 So.2d 584, 596 (Miss.1985).
Because the amount of payments under the Company Benefit Plan exceeded the amount of compensation payable by law, employer argues that it is entitled to even greater credit, suggesting that in fact claimant "has already received the equivalent of 94 weeks compensation...." In other words, employer would have us take the total amount paid under the Company Benefits Plan and divide the same by [the amount payable under the workers' compensation formula] and with the number of weeks yielded by this mathematical division process being the number of weeks for which employer is entitled to credit.
Id. The Court found that the credit did not work that way. The employer was entitled to credit for fully paying each week of benefits for a year, but the excess in weekly company disability payment above the workers' compensation benefit amount did not gain the employer additional credit to reduce the next year's workers' compensation benefits. Id.
¶ 25. Therefore, determining the total amount of workers' compensation benefits that were due for the entire four-year period of 1994-1998, then crediting against that amount the total compensation received during the periods of work during those four years, does not lead to the right credit.
¶ 26. There is a more fundamental problem than the arithmetic. A worker is not entitled to temporary total disability benefits if the worker is not totally disabled. The claimant may be working at reduced wages because of his injuries. That is a partial disability. We find a useful explanation of temporary partial disability in a recent chapter in a legal encyclopedia:
Typically, these [temporary partial disability] benefits are due when the worker returns to work but the effect of the injury makes work temporarily unavailable to the workers at the same pay as before the injury. It is not unusual for the benefits to be preceded by temporary total disability benefits and could be followed by permanent partial benefits or by no further benefits if there is no permanent disability.
John R. Bradley & Linda A. Thompson, Workers' Compensation Law § 76.40, in 9 ENCY. OF MISS. LAW (Jeffrey Jackson & Mary Miller, eds., 2002), at 167-68.
¶ 27. We acknowledge that the administrative judge's approach simplified the calculations, but Howard is here seeking the more arduously performed but more accurate calculations of the extent of partial disability that existed during most of this period, and the extent for briefer periods that total disability existed, and even if there were periods when there was no disability at all. Though this is Howard's *255 issue, we also find that because of the nature of the credit as explained in Aden, crediting the entire wages earned for the period against the entire compensation benefits that would be paid for total disability for four years may credit too much to the employer.
¶ 28. Howard is entitled to that accuracy, and so is the claimant. We agree with the language in the Commission's order, which stated that Robinson was entitled to "temporary disability benefits from February 16, 1994 through January 5, 1998 only for those periods of time when he was, because of injury, unable to work and earn his full pay." We remand so that this concept is reflected in the actual calculation of benefits that are owed for the four years.
III. Proof of permanent loss of wage-earning capacity
¶ 29. The Commission awarded Robinson a permanent partial impairment rating of ten per cent because of cervical and back injuries. Any finding of a disability must be supported by medical evidence. Miss.Code Ann. § 73-3-3(i) (Supp. 2001). Howard contends that this award is not.
¶ 30. As with a previous issue, Howard avers that there was no objective medical evidence to establish a permanent disability, and that the only proof that Robinson offers is his allegations of pain. The Commission accepted Dr. D'Angelo's assessment that Robinson suffered a ten percent permanent impairment to the body as a whole based on "chronic pain associated with the injuries without neurological deficit." D'Angelo assigned a five percent rating each to the disability arising from the back pain and that arising from the cervical pain. Howard characterizes this as a finding based "solely on the Employee's subjective complaints of pain." Howard is correct. We have already discussed that such a finding is permitted, though the Commission is to be wary of malingering and to reject complaints that are inherently improbable, incredible or unreasonable. We find nothing in the evidence to suggest that this admonition was ignored. The believability of this pain was accepted by at least two physicians whose evidence was received.
¶ 31. We earlier discussed the evidence of a cervical injury. As to the Commission's finding permanent disability also because of lower back problems, that is based on the original injury that Robinson suffered in 1994. Dr. D'Angelo assigned restrictions and a permanent five percent impairment rating solely because of the pain in his back. Dr. Robert Smith also had examined Robinson, and his evidence was offered by the employer. Dr. Smith examined Robinson in November 1997 and found a bulging lumbar disk. He put various restrictions on Robinson's work duties and assigned a permanent partial impairment rating of five percent to the body as a whole.
¶ 32. We find substantial evidence of permanent disability of ten percent. We agree with Howard that the issue was contested and contrary medical evidence was presented. The Commission's discretion in choosing which evidence to accept was not abused.
IV. Calculation of loss of wage earning capacity.
¶ 33. The Commission found that the permanent impairment resulted in a loss of $ 75 a week in earning capacity. The administrative judge in announcing this figure admitted to its inexactitude. She found that Robinson's earnings had varied among the various employers described in the evidence, that he had substantial restrictions that would prevent his maintaining his highest-paying past position *256 as a full-time welder. No mathematical calculations appear. The Commission adopted the conclusion without making any reference to specific wages before or after the injury.
¶ 34. The weekly benefit for permanent partial disability is two-thirds of the difference between the claimant's average weekly wage at the time of the injury and his wage-earning capacity "in the same employment or otherwise." Miss.Code Ann. § 71-3-17(25) (Rev.2000). It was stipulated that Robinson's average weekly wage when his back injury occurred was $527 in 1994. It was further stipulated Robinson's average weekly wage when his alleged cervical claim arose was $ 443 in 1997. The averaged "average weekly wage" during the period in which both injuries occurred was $485. Howard presented evidence that Robinson earned an average weekly wage of $551.85 in subsequent employment, actually earning more than he earned at Howard, giving support to their claim that Robinson did not suffer a loss of wage earning capacity. There is a rebuttable presumption created that there is no loss of wage earning capacity when the claimant returns to work and is able to earn the same or greater wages than before the injury occurred. Wilcher v. D.D. Ballard Const. Co., 187 So.2d 308, 310 (Miss.1966).
¶ 35. The rebuttal included evidence that a major portion of Robinson's post-injury earnings were the result of overtime. This overtime was not guaranteed. The administrative judge in a footnote gave this explanation for the absence of any explanation for how the $75 figure was derived.
The wage loss in this case is not an exact calculation. There were two injuries with two average weekly wages but ultimately each injury disabled the body as a whole. Likewise the claimant has demonstrated a capacity for earning post injury which has varied between employers, and there is some inference that his first employment ran out subsequent to the incident which Dr. D'Angelo relates to the cervical injury. More significantly, the permanent restrictions placed on the claimant include the restriction that he not weld on a regular permanent basis, allowing only "spot" welding or occasional welding. This deprives the claimant of his principal occupation or trade and the chief source of income for the past 15 years.
¶ 36. The $75 figure would seem to reflect the conclusion that the impact of these injuries on Robinson's wages was not profound, but that some amount had to be assigned because of the permanent impairment rating. The evidence does support that Robinson can no longer physically perform welding jobs that pay more today than do other jobs that he can perform today.
¶ 37. Among the ways to rebut the presumption of no loss of earning capacity because current wages are equivalent to those pre-injury, are these:
Increase in general wage levels since the time of accident; claimant's own greater maturity or training; longer hours worked by claimant after the accident; payment of wages disproportionate to capacity out of sympathy to claimant; and the temporary and unpredictable character of post-injury earnings.
Smith v. Picker Service Co., 240 So.2d 454, 456 (Miss.1970), quoting 2 LARSON, WORKMEN'S COMPENSATION LAW (1952), § 57.21. Some of this sort of evidence was introduced, but we find nothing that directly or even by reasonable inference leads to the $75 figure.
¶ 38. Here, the difficulty was to determine a figure that is based on evidence, when the evidence is of something inexact *257 and subject to many variables. The employer should not be made to suffer because the fact-finder contrives a figure out of frustration and the appellate court accepts it out of deference. On this state of the record, we are at a loss of whether there was any significant effort to determine a figure, or whether $75 was just adopted as a relatively low amount that represented some loss of capacity to earn wages. We find the reason for this amount to be sufficiently indecipherable that we remand to the Commission to explain in further fact-findings, or to adopt some other figure that on further review better represents the evidence.
V. Subsequent Intervening Injury
¶ 39. Robinson suffered an injury while working for a subsequent employer. Howard argues that this injury absolved it of financial responsibility. While employed at Big B Valve in 1998, Robinson attempted to turn his head to the left, felt something pop in his neck, and passed out from pain. Howard calls this a subsequent intervening injury. It relies in part on the fact that Robinson had been cleared to go back to work by several physicians before leaving Howard. This, Howard suggests, proves that all of Robinson's injuries acquired while at Howard were resolved.
¶ 40. The general rule is that "when a pre-existing disease or infirmity of an employee is aggravated, lighted up, or accelerated by a work-connected injury, or if the injury combines with the disease or infirmity to produce disability, the resulting disability is compensable." Rathborne, Hair & Ridgeway Box Co., v. Green, 237 Miss. 588, 594, 115 So.2d 674, 676 (1959). That rule requires that the effects of the former injury no longer be present at the time that a later injury occurs. On the other hand, "an employer remains liable for all manifestations of an injury, regardless of how long the manifestations continue, but if an independent agency terminates the effect of the original injury, the employer is not liable for subsequent injuries." Wal-Mart Stores Inc. v. Fowler, 755 So.2d 1182, 1185 (Miss.Ct.App.1999). An employer also remains liable if a prior compensable injury makes the claimant more prone to a subsequent injury. Id. at 1186. For Howard to prevail, it must be established that effects of the 1997 cervical injury did not contribute to the cause of the injury that was suffered at Big B Valve.
¶ 41. The defense of intervening cause is an affirmative one. The burden of proof is on the first employer. Marshall Durbin Co. v. Warren, 633 So.2d 1006, 1008 (Miss. 1994). The Commission found no medical evidence that the injury that occurred at Big B Valve was independent of the injury that occurred while Robinson was employed by Howard. Robinson had not been released to go back to work with all of his injuries resolved. In part this argument arises from the same point as in previous issues, namely, that the only basis that Robinson has that he continued to suffer from injuries at Howard was the pain that he reported, pain not based on any identifiable physical cause. We have rejected that as a reason to reverse the finding of disability.
¶ 42. Robinson was still under several vestigial restrictions while at Big B Valve. He was not to weld on a repetitive basis because the weight of the welder's hat was deemed by Dr. D'Angelo to be the source of Robinson's cervical injury. Dr. D'Angelo stated this in his affidavit:
this problem is no different than the problem that he had before.... In analysis of this situation, it seems that the original neck pain from the previous injury was exacerbated by movement of his neck and arm. This led to the patient being caught in the hoses. When *258 he hung in the hoses, he must have stretched his neck or caused his neck to move abruptly, causing a second injury on top of the first injury. He may not have had the second injury if he did not have the neck pain initially.
¶ 43. The Commission's finding that the later injuries were not totally independent of those at Howard is supported by substantial evidence.
VI. Carpal Tunnel Syndrome
¶ 44. Howard finds nothing in the record to support the Commission's conclusion that Robinson's carpal tunnel syndrome was causally related to his employment with them. The company also argues a statute of limitations issue that we will address first.
¶ 45. If no payment of compensation, with the exception of funeral or medical expenses, is made within a two-year period from the occurrence of the injury, and no claim is filed, the claim is barred. Miss. Code Ann. § 71-3-35 (Supp.2001). Dr. D' Angelo's report of June 4, 1997, indicated that Robinson was experiencing symptoms of carpal tunnel syndrome. Since Robinson did not file his motion to amend his claim for carpal tunnel syndrome until June 22, 1999, nor had Howard paid for any treatment for carpal tunnel during that period, Howard argues that the claim is barred.
¶ 46. Howard properly raised the affirmative defense of the statute of limitations in its answer, procedurally making this a viable defense. The two-year statute of limitations is tolled until the injury becomes apparent. Struthers Wells-Gulfport, Inc. v. Bradford, 304 So.2d 645, 649 (Miss.1974). Carpal tunnel syndrome is a gradual infirmity and is not immediately recognizable. Lucas v. Angelica Uniform Group, 733 So.2d 285, 288 (Miss.Ct.App.1998). The limitations period begins once "a claimant is, or reasonably should be aware of having sustained a compensable injury, but the statute is deemed not to have began running if the claimant's reasonably diligent efforts to obtain treatment yield no medical confirmation of compensable injury." Georgia Pacific Corp. v. Taplin, 586 So.2d 823, 828 (Miss.1991).
¶ 47. Dr. D'Angelo's medical affidavit revealed that Robinson had possible left carpal tunnel syndrome, which he thought on June 4, 1997, was work-related. At the time of this diagnoses, Robinson was employed by Howard. He later worked for Big B Valve which required him to use his hands in tightening nuts and bolts. Howard argues that this type of repetitive motion was more likely the cause of Robinson's ailment than the welding he performed while employed by them. On May 17, 1999, Dr. Lon Alexander concluded that Robinson had carpal tunnel syndrome. He stated that he was unable to say to a reasonable degree of certainty that it began during his employment with Howard. However, Dr. Alexander believed that the type of work that Robinson did at Howard could be the cause of his carpal tunnel syndrome.
¶ 48. The Commission did not make a finding as to when Robinson should have been aware that the carpal tunnel syndrome not only existed, and not only that it was work-related, but that it created a "disability." For this reason we reverse and remand to the Commission for a finding of fact on when Robinson knew or should have known by the reasonable use of care and diligence that the carpal tunnel syndrome was a compensable injury. If Robinson should have known more than two years prior to June 22, 1999, then his claim is time-barred.
*259 ¶ 49. Next we address whether Robinson's carpal tunnel syndrome can be attributed to his employment at Howard. If not, the timeliness of Robinson's claim is irrelevant. Unless common knowledge suffices, medical evidence must prove not only the existence of a disability but also its causal connection to employment. Bradley & Thompson, Workers' Compensation Law, § 76:53, in 9 ENCY. MISS. LAW, at 182-84. The medical evidence is sufficient if it supports, even if it does not fully prove, a finding of disability. Hall of Mississippi, Inc. v. Green, 467 So.2d 935, 938 (1985). Dr. Alexander stated in his deposition that it was possible that Robinson acquired carpal tunnel syndrome while working as a welder for Howard, due to the type of work he performed. Dr. Alexander also stated that if Robinson had complained of carpal tunnel symptoms during employment with Howard, and the proof shows that Robinson had, the doctor could ascribe the carpal tunnel syndrome to the welding work to a reasonable degree of medical certainty. That is substantial medical evidence of the existence and work connection.
¶ 50. We note that the Commission did not award any permanent partial disability benefits as a result of the carpal tunnel syndrome. The $50 per week award was due to the whole body injuries regarding the back and neck. Instead, Howard was simply ordered to pay medical expenses benefits arising from the carpal tunnel syndrome. We find no error in this.
VII. Medical Treatment
¶ 51. Howard denies financial responsibility for reasonably necessary medical treatment of any of Robinson's injuries. An employer has a duty to provide "such medical, surgical, and other [services] ... for such period as the nature of the injury or the process of recovery may require." Miss.Code Ann. § 71-3-15 (Rev.2000). There is sufficient evidence in the record to support a finding that Robinson suffered both a lower back and cervical injury while employed by Howard to justify a ten percent impairment rating to the body as a whole. Since both of these injuries are compensable under the Act, we find that Howard is bound to provide the reasonable medical care for Robinson's recovery. Bradley & Thompson, Workers' Compensation Law, in 9 ENCY. MISS. LAW § 76:102 (employer to pay for reasonable, necessary and appropriate medical services and supplies). Whether Howard will be responsible for Robinson's carpal tunnel syndrome remains unresolved.
VIII. Penalties and Statutory Interest
¶ 52. Howard maintains that it has provided all the benefits required and therefore it does not owe any penalty or interest. However, since we are upholding the award of permanent partial disability, the applicable penalties and interest are due.
IX. Admission of Evidence
¶ 53. The administrative judge would not admit into evidence copies of the Laurel Leader Call newspaper. The stated purpose was to demonstrate through classified advertisements the available positions that Robinson could have obtained. However, Howard was allowed to introduce a twelve-page exhibit listing these advertisements in that newspaper and the dates that they were published. This list represented counsel's effort to collect the advertisements of positions that were available in the Laurel area consistent with Robinson's restrictions. The company also offered the newspapers themselves, but the administrative judge would not admit them.
¶ 54. Howard was allowed to present the evidence in a readily accessible form for the various tribunals to use. The refusal to admit the cumulative evidence of the actual newspapers was not error.
X. Cross-Appeal
*260 ¶ 55. Robinson argues on cross-appeal that the Commission committed error by reducing Robinson's weekly award by one-third. We find that the Commission was exactly correct that a claimant is only to receive two-thirds of the loss of wage earning capacity during the period of permanent partial disability. We have reversed and remanded for findings as to the calculation of that loss. We find nothing new to consider as a result of the cross-appeal.
¶ 56. THE JUDGMENT OF THE CIRCUIT COURT OF JONES COUNTY ON DIRECT APPEAL IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART TO THE MISSISSIPPI WORKERS' COMPENSATION COMMISSION FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. THE JUDGMENT IS AFFIRMED ON CROSS-APPEAL. THE COSTS OF THE APPEAL ARE ASSESSED EQUALLY TO THE APPELLANT AND TO THE APPELLEE.
McMILLIN, C.J., KING, P.J., BRIDGES, THOMAS, LEE, IRVING, MYERS, CHANDLER AND BRANTLEY, JJ., CONCUR.