909 So.2d 1209 (2005)
UNIVERSITY OF MISSISSIPPI MEDICAL CENTER and Mississippi Institutions of Higher Learning, Self-Insured, Appellants
v.
David H. SMITH, Appellee.
No. 2003-WC-02610-COA.
Court of Appeals of Mississippi.
February 1, 2005.
*1213 Joseph T. Wilkins, III, Jackson, attorney for appellants.
John Griffin Jones, Jackson, attorney for appellee.
Before LEE, P.J., MYERS and CHANDLER, JJ.
CHANDLER, J., for the Court.
¶ 1. This workers' compensation appeal requires us to determine whether or not the Workers' Compensation Commission properly applied a rebuttable presumption of no loss of wage earning capacity to bar recovery for the claimant's admittedly work-related injury. The Circuit Court for the First Judicial District of Hinds County held that the Commission misapplied the presumption and reversed the Commission's denial of benefits to David H. Smith. The self-insured employer, University of Mississippi Medical Center and Mississippi Institutions of Higher Learning (UMC), appeals. UMC contends that the circuit court wrongly substituted its own opinion for that of the Commission despite substantial evidence supporting the Commission's decision.
¶ 2. We find the Commission erred by applying the presumption of no loss of wage earning capacity. We further find that Smith showed that he was permanently totally disabled. Therefore, we affirm the decision of the circuit court.

FACTS
¶ 3. Smith worked as a carpenter for UMC. He sustained an admittedly compensable injury to his neck in 1993 for which he had surgery on November 5, 1996. On January 5, 1999, he filed a petition to controvert. After a hearing on November 1, 1999, the administrative law judge found Smith to be permanently, totally disabled and awarded Smith disability benefits and the cost of medical services and supplies. The Commission reversed that decision.
¶ 4. UMC hired Smith as a carpenter in 1993. Smith testified that he has a high school education and two years' experience in the military. His prior work experience was as a carpenter, millwright, truck driver and liquor store owner. At UMC, Smith repaired and maintained the outside areas of several buildings on the campus in Jackson. Though he was part of a twelve person crew, Smith primarily worked by himself on assigned tasks. He commuted to UMC from his home in Crystal Springs. He was sixty-two years old at the time of the hearing. Smith's stipulated average weekly wage was $404.39
¶ 5. In March 1993, Smith strained his neck while helping another worker carry a two to three hundred pound steel door up a flight of stairs. He immediately reported the injury to his supervisor and went to the employee health department. He began a course of physical therapy lasting for two weeks during which he continued to work. Smith did not improve, and he saw Dr. Robert McGuire, an orthopedic surgeon at UMC, on June 4, 1993. Dr. McGuire's impression was a cervical spondylosis with a C6 radiculopathy. He prescribed traction and an anti-inflammatory. He felt that Smith could continue working, but within the confines of his pain.
¶ 6. Over the next three years, Smith continued to have problems, but his physical condition remained unchanged upon examination. On September 30, 1996, Smith saw Dr. McGuire and reported increased neck pain that had progressed over the previous month. Dr. McGuire found that Smith had developed some neurologic problems and an MRI of the cervical spine revealed stenosis at the C5-6 level with the disc essentially absent. Dr. McGuire *1214 performed an anterior diskectomy and innerbody fusion at the C5-6 level on November 5, 1996. During the surgery, Dr. McGuire found the "disc was essentially worn out with a big osteophyte formation causing compression of the nerve itself."
¶ 7. At Smith's request, Dr. McGuire released him to return to work on light duty status on November 18, 1996. On December 16, 1996, Dr. McGuire removed Smith's brace and allowed him to return to full activities as he could tolerate them. Dr. McGuire noted that Smith had good recovery and his strength was essentially back to normal. In his deposition, Dr. McGuire opined that Smith reached maximum medical improvement on December 16, 1996. Smith received temporary total disability benefits from November 4, 1996 to December 29, 1996.
¶ 8. In February 1997, Smith returned to Dr. McGuire and said that he was starting to have some headaches. Dr. McGuire said that, while Smith was doing well from a neurologic standpoint, the headaches were "a little bit of a new pattern." He prescribed a collar, but when that failed to alleviate the headaches, he referred Smith to a neurologist, Dr. Jim Corbett.
¶ 9. Dr. Corbett saw Smith on February 18, 1997. He diagnosed Smith with very rare cervicogenic headaches and placed him on Naprosyn. In a letter to Nancy Sistrunk, a claims specialist with American Federated General Agency, Inc., Dr. Corbett opined that Smith's cervicogenic headaches were related to Smith's workers' compensation injury on January 12, 1996,[1] and had either resulted from the injury itself or from the injury's aggravation of a pre-existing condition. Dr. Corbett stated that the headaches were related to Smith's neck injury and its subsequent repair, which damaged the soft tissue structures in the neck and caused pain to radiate into the back of the head.
¶ 10. On June 20, 1997, Smith told Dr. McGuire that his headaches were essentially resolved. On July 24, 1997, Smith returned to Dr. Corbett complaining of dizziness. After testing, Dr. Corbett ruled out vertebrobasilar arterial disease. On August 19, 1997, Smith reported that he had not had a dizzy spell for three to four weeks, but complained that Naprosyn had not helped his headaches and neck pain and that he was taking Ultram instead.
¶ 11. Smith returned to Dr. McGuire complaining of numbness in his hand; Dr. McGuire suspected carpal tunnel patterns. An MRI on September 29, 1997 revealed degenerative changes at the C4-5 level, above the site of the fusion surgery. The MRI showed osteophytes at C4-5 causing severe left neural foramina narrowing, neural foramina narrowing at C5-6, a left uncinate process spur at C6-7 with moderate neural foramina narrowing, and loss of signal in the disc spaces of the entire cervical spine. Dr. McGuire said that the degeneration at C4-5 was probably related to the fusion, which stresses the levels above and below the fusion site. He stated that Smith's fusion surgery and resultant C4-5 degeneration were related to his March 1993 injury to a reasonable degree of medical probability.
¶ 12. Dr. McGuire referred Smith to Dr. William Geissler for his hand condition. Dr. Geissler began investigating the possibility of carpal tunnel syndrome. An electromyelogram did not show nerve compression at the wrist. Dr. Geissler's impression *1215 was that Smith's carpal tunnel symptoms resulted from nerve compression at the neck exacerbating slight compression at the wrist, known as a "double crush" phenomenon. Smith's symptoms improved somewhat with a wrist brace, and he continued to work.
¶ 13. At some point, Smith applied for disability retirement with the Public Employees' Retirement System (PERS). Smith testified that his application was prompted by Dr. McGuire's informing him that there was nothing more he could do for his neck and advising him to seek disability retirement. That recommendation does not appear in either the correspondence or the deposition of Dr. McGuire that were in the record before the Commission. However, the record before the Commission did not include Dr. McGuire's complete medical records on Smith and only included three of Dr. McGuire's office notes appearing in the medical records of another physician.
¶ 14. On June 3, 1998, Smith saw Dr. David Collipp for a PERS disability evaluation. In the evaluation, Dr. Collipp stated that Smith's job included lifting and carrying over 100 pounds, overhead work, crawling, bending, and stooping, and that while Smith tolerated the work as best he could to stay employed, Smith was concerned that his work activities would cause increasing damage to his neck over time. Smith reported that he suffered from headaches that initially improved after the surgery but which had slowly returned.
¶ 15. Dr. Collipp stated that Smith exhibited no pain behavior or pain magnification and provided excellent effort throughout the exam. Dr. Collipp observed that Smith had no strength deficits but had diminished reflexes and a decreased range of cervical motion. His impression was that Smith had increasing neck pain secondary to cervical strain. He stated:
All in all this gentleman is presently at work and that would suggest that he is able to tolerate his work. It is notable however that he has difficulty looking up which was absolutely consistent with his surgery. I think that he is probably working to his absolute limits of pain as well as his absolute physical limits, and that he would be best protected by receiving appropriate restrictions. He has explained that restrictions would not be something he would be able to work within at his present job, but I think that for his present underlying condition we should get cogent restrictions regarding his neck and his back. I reminded him to participate well with a functional capacity evaluation. It is my impression that there is going to be a limitation on his overhead work as well as a limitation in terms of his lifting. These limitations may exclude him from his present duty even though he is operating right now just within those limitations. I think that the sporadic nature of some of his duties allow[s] him time to recover from some of them, but if he does these too frequently he could cause some significant damage.
¶ 16. Smith's condition was unchanged upon examination by Dr. McGuire on July 6, 1998. On August 27, 1998, Dr. McGuire assigned Smith an impairment rating of eleven percent to the body as a whole resulting from his multilevel cervical spondylosis changes with limited motion and fusion. Smith retired from UMC on August 29, 1998 and began receiving PERS disability benefits.
¶ 17. In December 1998, Dr. McGuire referred Smith to Dr. Robert Strong at UMC's Pain Management Center. Dr. Strong assessed Smith with chronic neck pain and headaches and placed him on a regimen of pain medications including narcotics. *1216 Smith began seeing Dr. Strong regularly. On March 22, 1999, Dr. McGuire placed job restrictions on Smith consisting of no heavy overhead work, no repetitive flexion or extension of the cervical spine or keeping the neck in an extended position for a period of time, and no lifting items weighing more than thirty to fifty pounds.
¶ 18. Smith stated that his supervisor at UMC had accommodated his limitations since his 1993 injury. Smith stated that he had problems performing his job at UMC. He had constant headaches that were sometimes so severe he could not concentrate, he could not perform overhead work, and it had been "a miserable forty hours a week."
¶ 19. Smith testified that, at the time of the hearing, he suffered from constant headaches. One or two times per week his headaches became so severe he was forced to lie down for one or two hours to take the weight off his neck. Smith said that, during severe headaches, his vision became blurred and he could not drive or concentrate on anything. He stated that his severe headaches had no precipitating cause and would "just start." Smith maintained that he could work full-time only if allowed to lie down during severe headaches. He said that his pain medication also interfered with his ability to drive long distances and, therefore, had affected his job search.
¶ 20. Smith's PERS disability benefits imposed an annual earnings limitation on Smith. Smith admitted that his PERS disability status restricted him from returning to full-time work. He stated that, despite the PERS restrictions, the severity of his neck condition prevented him from returning to full-time employment and the neck condition had prompted his application for PERS benefits in the first place.
¶ 21. Smith admitted he had performed several light carpentry projects since retiring. He made $100 for repairing corner boards on the eaves of a house. He earned $150 for helping to repair a barn. Every couple of months, Smith performed repairs for a rental property owner for $15.00 per hour, such as installing plywood flooring. He stated that the property owner only gave him work within Smith's self-described limitations. His other projects included building a cabinet, for which he made $717, installing a microwave, helping two other people install a chain link fence, replacing rotten wood on a patio, and building a storage box. Smith stated that he was unable to do this type of work on a regular basis, and that his employers allowed him to work at his own pace, which was twenty to thirty percent slower than before his injury. For the duration of each project, he worked between two and five hours a day depending on how he felt. He said that most of these jobs were located in Crystal Springs but a few were in the Jackson area.
¶ 22. Smith testified that he had not searched for full-time employment. Smith stated that he was willing to work full-time but feared no employer would accommodate his need to rest during severe headaches. He had inquired about part-time work with Waller Construction Company, but only full-time work was available. He also had inquired at Evan Johnson, which was not hiring.
¶ 23. Bruce Brawner, a vocational rehabilitation specialist, opined that Smith could perform his usual employment of carpentry and millwright work only with accommodation. He had reviewed a functional capacity evaluation, not included in the record, stating that Smith could perform work at the light to medium level and confirming the work restrictions imposed by Dr. McGuire. Brawner performed a *1217 survey of available jobs within the restrictions imposed by Dr. McGuire. Brawner did not consider Smith's headaches because no physician had assigned Smith work restrictions based upon the headaches. Brawner testified that, taking Smith's testimony regarding the restrictive nature of the headaches as true, Smith would be unable to work a regular forty hour week.
¶ 24. Brawner tendered several lists of full-time jobs to Smith between August and October 1999. The highest paying jobs Brawner located were security guard positions at UMC, paying $9.16 per hour, and at St. Dominic's Hospital, paying $8.40 per hour. Brawner located seven other security guard positions, each with different pay ranges, and with a combined pay range of $5.00 to $8.00 per hour. Brawner found a cabinet maker position which paid $7.83 per hour according to the Mississippi Employment Security Commission average for that job. He located two jobs at a convenience store, a $6.00 per hour manager position and a $5.50 per hour cashier position. Brawner also located a $7.00 per hour job cleaning pagers.
¶ 25. Brawner testified that Smith had not applied for every job as of the dates he followed up with the employers, but admitted that his last follow-up was a over month before the hearing and Smith could have applied since the last follow-up. Smith testified that, with one exception, he applied for every job tendered by Brawner and received only two job offers. The job for which Smith did not apply was as a security guard at Northpark Mall. Smith stated that he traveled to Northpark Mall and asked for an application on two occasions, but both times no one was available to give him an application. The two job offers were from Gun Sight Security, paying $5.15 to $6.00 per hour and Pendelton Security, paying $5.15 to $7.00 per hour. Smith said he declined those offers because he felt his neck condition restricted him from full-time work. Additionally, he did not feel that it was worthwhile for him to accept a minimum wage job in Jackson because the pay was too low to justify his commuting expenses. He felt capable of performing all the jobs which Brawner located on a part-time basis.
¶ 26. The administrative law judge found Smith had suffered a permanent, total loss of wage earning capacity due to his work-related injury, and UMC appealed to the Commission. Further medical evidence was admitted before the Commission. In a March 8, 2000 letter, Dr. Strong stated that he had managed Smith on various levels of narcotics trying to increase his level of function, and Smith had "tried multiple times to continue working but he has difficulty with being able to drive on the pain medications and with movements working aggravating his pain." Also included was a Social Security Administration determination that Smith was entitled to disability insurance benefits.
¶ 27. The full Commission reversed the decision of the administrative law judge. The Commission found that Smith had failed to prove his entitlement to any permanent disability benefits because Smith had not rebutted the presumption of no loss of wage earning capacity that arose because he continued at the same job after his 1996 surgery. The Commission also found Smith presented no credible medical evidence that he was unable to work and Smith's only limitations from returning to full-time, comparably gainful employment were his desires to care for his disabled wife and to maintain his PERS disability status. Smith appealed to the circuit court, which reversed the decision of the Commission and reinstated the opinion of the administrative law judge. UMC appeals.

*1218 STANDARD OF REVIEW
¶ 28. The Commission sits as the fact-finder in workers' compensation cases. Smith v. Jackson Const. Co., 607 So.2d 1119, 1123-24 (Miss.1992). The decision of the Commission, not that of the administrative law judge, is the agency decision entitled to deference from this Court. Id. The circuit courts performs an appellate function and employs the same deferential standard of review used by this Court. Id. at 1124.
¶ 29. We may reverse the Commission's decision only when its fact-findings are not supported by substantial evidence or are arbitrary and capricious. Weatherspoon v. Croft Metals, Inc., 853 So.2d 776, 778 (¶ 6) (Miss.2003). "Substantial evidence" is more than a scintilla. Cent. Elec. Power Ass'n v. Hicks, 236 Miss. 378, 389, 110 So.2d 351, 357 (1959). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and affords "a substantial basis of fact from which the fact in issue can be reasonably inferred." Id.
¶ 30. We review the Commission's application of the law de novo. ABC Mfg. v. Doyle, 749 So.2d 43, 45 (¶ 10) (Miss.1999). The legal effect of the evidence and the conclusions drawn therefrom present questions of law, "especially when the facts are undisputed or the overwhelming weight of the evidence reflects them." Cent. Elec. Power Ass'n, 236 Miss. at 388-89, 110 So.2d at 356. "[W]hen the agency has misapprehended a controlling legal principle, no deference is due." ABC Mfg., 749 So.2d at 45 (¶ 10).

LAW AND ANALYSIS
¶ 31. The sole issue in this case is whether the Commission's denial of permanent disability benefits to Smith was unsupported by substantial evidence, was arbitrary and capricious, or was based upon an erroneous application of the law. "`Disability' means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings." Miss.Code Ann. § 71-3-3(i) (Rev.2000). The concept of disability comprises a physical injury coupled with a loss of wage earning capacity. I. Taitel & Son v. Twiner, 247 Miss. 785, 792, 157 So.2d 44, 46 (Miss.1963). Disability is determined by comparing the employee's pre-injury wages with the employee's post-injury capacity to earn wages in the open labor market. Karr v. Armstrong Tire & Rubber Co., 216 Miss. 132, 137, 61 So.2d 789, 792 (1953). The claimant bears the burden of proof of disability and the extent thereof. Am. Potash & Chem. Corp. v. Rea, 228 So.2d 867, 868 (Miss.1969).While medical evidence must support the claimant's incapacity and its extent, the fact of disability need not be proven entirely by medical evidence. Hall of Miss., Inc. v. Green, 467 So.2d 935 (Miss.1985).
¶ 32. The Commission applied a presumption of no loss of wage earning capacity to this case because, after his 1996 surgery, Smith continued to work at UMC at the same or higher pay. A presumption of no loss of wage earning capacity arises when the claimant's post-injury earnings are equal to or exceed pre-injury earnings. Gen. Elec. Co. v. McKinnon, 507 So.2d 363, 365 (Miss.1987). The claimant may rebut the presumption by presenting evidence that the post-injury earnings are an unreliable indicator of wage earning capacity because of an "increase in general wage levels since the time of accident, claimant's own greater maturity and training, longer hours worked by claimant *1219 after the accident, payment of wages disproportionate to capacity out of sympathy to claimant, and the temporary and unpredictable character of post-injury earnings." Id. The Commission found that Smith failed to rebut the presumption.
¶ 33. Smith argues that the Commission erroneously applied the presumption because the evidence indicated that his condition progressively worsened after the surgery. Indeed, the medical evidence in this case was undisputed and shows that Smith's health deteriorated after his November 1996 surgery. In February 1997, Smith developed headaches, which Dr. McGuire recognized were a "new pattern." Dr. Corbett determined the headaches were cervicogenic headaches caused by the neck injury and surgery; the headaches necessitated continuous treatment with narcotics beginning in December 1998. Smith's cervical spine underwent further degeneration as evidenced by Dr. McGuire's testimony about the 1997 MRI revealing degenerative changes at C4-5, above the surgical site. Finally, in September 1997, Smith developed carpal tunnel symptoms due to nerve compression at the cervical spine. In August 1998 Smith received a permanent disability rating. All of these conditions manifested after the surgery and all of them were related by Smiths' physicians to the neck injury and surgery.
¶ 34. The facts of this case bear similarity to those in J.H. Moon & Sons, Inc. v. Johnson, 753 So.2d 445 (Miss.1999). In J.H. Moon, Johnson was injured at work in 1981 and had cervical disc fusion surgery the next month. Id. at 446 (¶ 2). Johnson kept working but had continuing pain in his arms and hands due to nerve compression from the injury and fusion surgery. Id. at (¶ 3). Johnson had additional neck surgery in 1985, but experienced further numbness in his arm and hand. Id. at (¶ 4). He continued to complain of pain and, in 1993, his physician declared him totally disabled from work due to the condition. Id. at (¶ 6-7).
¶ 35. The parties agreed that Johnson was permanently and totally disabled, but disagreed on whether disability payments were to be calculated based on Johnson's pay in 1981, when Johnson was injured, or in 1993, when Johnson was declared disabled from work. Id. at 447 (¶ 9-11). The supreme court relied upon Oklahoma precedent holding, "where there is an accident which does not incapacitate but is progressive in nature, it is proper to consider the earnings of claimant between the date of the accident and the date of the disability." Id. at 448 (¶ 14) (quoting Pepsi Cola Bottling Co. of Tupelo v. Long, 362 So.2d 182, 185-86 (Miss.1978) (citing Phillips Petroleum Co. v. Malcolm, 175 Okla. 512, 53 P.2d 1113, 1114 (1936))).
¶ 36. The court held that Johnson's condition was progressive and, therefore, he was entitled to compensation at the 1993 pay rate. Id. at 449 (¶ 19). Johnson's injury was progressive because it "gradually worsened and progressed to a point where, by 1993, Johnson was unable to work." Id. at (¶ 17). The court found that Johnson's injury
was not complete until it was determined that he was disabled or had a permanent injury.... If the injury is deemed progressive in nature, we are confronted with a 1981 accident which caused an injury that was gradual and progressive and which ultimately manifested itself in 1993 as a total disability and permanent injury. To hold otherwise would punish Johnson economically for his ever worsening physical condition.
Id. at (¶ 17-18).
¶ 37. As in J.H. Moon, the medical evidence in this case shows that Smith's functional disability increased after the *1220 1996 surgery. Smith's continuation of work after the 1996 surgery could not give rise to the presumption of no lost wage earning capacity because his injury had not fully manifested in 1996. Rather, over the next year and a half his condition progressively worsened to the point that, according to his testimony, he was eventually forced to cease full-time work. As Smith's physical disability had not fully manifested when he returned to work in 1996, the Commission's application of the presumption that his injury caused no loss of wage earning capacity was erroneous.
¶ 38. Having cast aside the presumption of no lost wage earning capacity, we turn to the evidence of the fact and extent of Smith's permanent disability resulting from his work-related injury. An injured employee establishes a prima facie case of disability by showing that, because of the work-related injury, he cannot secure work in the same or other jobs at pre-injury pay. Ga. Pac. Corp. v. Taplin, 586 So.2d 823, 827 (Miss.1991). An employer may rebut the claimant's prima facie case of disability by showing that the claimant's effort to find employment was unreasonable or constituted a mere sham. Id. An evaluation of the reasonableness of the claimant's job search may include "consideration of job availability and economics in the community, the claimant's skills and background, as well as the subject disability itself." Id. (citing Piper Ind., Inc. v. Herod, 560 So.2d 732, 734-35 (Miss.1990)).
¶ 39. The Commission must determine the fact and extent of a claimant's loss of wage earning capacity by considering the evidence as a whole. DeLaughter v. South Cent. Tractor Parts, 642 So.2d 375, 379 (Miss.1994). "Factors which this Court has considered in determining loss of wage earning capacity include the amount of education and training which the claimant has had, his inability to work, his failure to be hired elsewhere, the continuance of pain, and any other related circumstances." McGowan v. Orleans Furniture Inc., 586 So.2d 163, 167 (Miss.1991) (citing Malone & Hyde of Tupelo v. Kent, 250 Miss. 879, 882, 168 So.2d 526, 527 (1964)). Doubtful cases are to be resolved in favor of compensation in order to fulfill the beneficent purposes of the Act. DeLaughter, 642 So.2d at 379.
¶ 40. The Commission found that Smith was physically capable of returning to full-time, comparably gainful employment and that there was no credible medical evidence Smith was unable to work. We find that conclusion unsupported by substantial evidence. On August 27, 1998, Smith received a permanent impairment rating of eleven percent to the body as a whole. On March 22, 1999, Dr. McGuire restricted Smith from overhead work, neck extension, and lifting items weighing over thirty to fifty pounds. At the time of the briefing before the Commission, Smith was still seeing Dr. Strong regularly for his headaches and was on a regimen of medications including narcotics for pain. Dr Strong stated that Smith had difficulty driving while on the medications and that his pain was aggravated by movements made while working. This undisputed medical evidence clearly established that Smith's work capabilities were impacted by the injury.
¶ 41. However, to prove disability, a claimant must show that the injury caused a loss of wage earning capacity in the same or other employment. The Commission held that Smith failed to show any lost wage earning capacity. The Commission found that Smith's real reasons for not seeking comparably gainful, full-time work were his desire to care for his ailing wife and the earnings limitation imposed by his PERS disability benefits. The *1221 Commission found Smith had testified that his wife's condition was "a major factor" in his decision to quit work at UMC. That finding was erroneous in that Smith never said that his wife's condition was a major factor in the decision. On the contrary, Smith denied that his wife's condition was a part of his decision to quit. Throughout his testimony, Smith repeatedly stated the reason he quit working at UMC was that he could no longer perform the job due to his neck injury.
¶ 42. Regarding Smith's PERS work restrictions, Smith did admit that the work restrictions attached to his PERS benefits limited him from full-time employment. But he also stated that, independent of the PERS work restrictions, he could not work full-time due to the neck injury and it was the neck injury that had prompted his PERS retirement. It is apparent from Smith's testimony that he was unwilling to waive his PERS disability status by seeking full-time employment. It is also apparent that he considered himself completely disabled from full-time work due to the neck injury. While Smith acknowledged that his PERS status restricted him from working full-time, that acknowledgment does not negate his testimony that his neck injury independently restricted his ability to work, especially when the neck injury was the reason Smith sought disability retirement in the first place.
¶ 43. The evidence showed that Smith lost wage earning capacity because at the time he left UMC he could not obtain work in the same or other employment at a wage equal to his pre-injury wage. Ga. Pac. Corp., 586 So.2d at 827. Smith showed he could no longer perform his carpentry job at UMC. Two months before Smith ceased working for UMC, Dr. Collipp opined that Smith was working up to his absolute physical limitations and, if he continued to perform some of his duties "too frequently," he could cause some significant damage. Smith testified that he could no longer do the job. Brawner, testifying for UMC, admitted that the work restrictions placed upon Smith by Dr. McGuire disqualified Smith from his carpentry job without accommodation. The willingness of Smith's supervisor to accommodate his neck injury does not prove Smith suffered no post-injury loss of wage earning capacity. This is because wages attributable to the kindness and generosity of an employer are not indicative of the employee's actual capacity to command a certain wage on the open labor market. O'Neal v. Multi-Purpose Mfg. Co., 243 Miss. 775, 781, 140 So.2d 860, 863 (1962). The employee has no "assurance that he will continue to be the beneficiary of the employer's magnanimity." Id.
¶ 44. The evidence showed Smith was incapable of matching or exceeding his pre-injury wages in other employment. Brawner located several full-time jobs outside of Smith's usual occupation of carpentry, taking into consideration Smith's age, work experience, education, and the work restrictions imposed by Dr. McGuire. None of the full-time jobs proffered by Brawner paid as much as Smith was making at UMC, and of those jobs the highest job offer Smith received paid between $5.15 and $7.00 per hour. Smith did not earn income anywhere near his pre-injury wages from his odd carpentry jobs, and he testified that he was physically unable to perform those jobs with greater frequency. Considering Smith's age, employment history, education, and physical limitations, the evidence established a permanent loss of wage earning capacity resulting from Smith's neck injury, and the Commission's finding of no permanent disability was not supported by substantial evidence and was arbitrary and capricious.
*1222 ¶ 45. The remaining question is the extent of Smith's permanent disability. Smith urges that we affirm the circuit court's reinstatement of the ALJ's finding of permanent total disability. The concept of permanent total disability was thoroughly discussed in Roling v. Hatten & Davis Lumber Co., 226 Miss. 732, 85 So.2d 486 (1956). "`Total disability may be found, in spite of sporadic earnings, if the claimant's physical condition is such as to disqualify him for regular employment in the labor market.'" Id. at 741, 489 (citation omitted). A claimant's performance of occasional work does not preclude a finding of total disability if the claimant "`is so injured that he can perform no services other than those which are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist.'" Id. at 742, 489 (citation omitted).
¶ 46. The ALJ found Smith was permanently totally disabled on the basis of Smith's testimony that his headaches limited him from full-time work because he had to lie down during severe headaches. The Commission's opinion did not mention Smith's headaches and only discussed his physical condition in terms of the neck injury and work limitations imposed by Dr. McGuire. The record contained undisputed medical evidence that Smith suffered from headaches caused by the neck injury, received regular treatment for the headaches, and that Dr. Strong managed his headache pain with narcotic medication. There was no medical evidence about the effect the headaches may have had on Smith's ability to work, only Smith's own testimony.
¶ 47. The issue of whether a claimant's permanent disability is partial or total is a fact question to be determined from the evidence as a whole, including both medical and lay testimony. McGowan, 586 So.2d at 167 (quoting Modern Laundry, Inc. v. Williams, 224 Miss. 174, 179-80, 79 So.2d 829, 832 (1955)). Lay testimony about the effect of the injury on the claimant's ability to work may be considered to supplement medical estimates of the claimant's functional or industrial disability. Id. A "claimant is competent to prove his own claim, and his testimony may be accepted without corroboration." Penrod Drilling Co. v. Etheridge, 487 So.2d 1330, 1333 (Miss.1986). "[T]he undisputed testimony of a claimant which is not so unreasonable as to be unbelievable, given the factual setting of the claim, generally ought to be accepted as true." White v. Superior Products, Inc., 515 So.2d 924, 927 (Miss.1987).
¶ 48. Smith's testimony about his headaches was uncontradicted, and the Commission never found it to be untrustworthy or unbelievable. Smith's testimony about the disabling effects of his headaches was entirely credible given the medical evidence that he received regular treatment for headache pain with narcotic medication. The Commission, as fact-finder, clearly erred by totally disregarding Smith's uncontradicted testimony, supported by undisputed medical evidence, about the disabling effects of his headaches.
¶ 49. As we find that Smith's limitations attributable to his headaches should have been accepted by the Commission, we proceed to the proof of the degree of Smith's lost wage earning capacity. We find that the evidence as a whole shows Smith was permanently totally disabled. At the time of the hearing, Smith was sixty-two years old with a high school education and disabled from his usual employment as a full-time carpenter. He can perform light duty work, but his most significant restriction is that he must lie down during severe headaches which occur randomly once or twice a week. As Dr. *1223 Strong noted, Smith has difficulty driving due to pain medication. Smith did show himself capable of performing part-time carpentry work for various employers on an irregular basis.
¶ 50. Smith considered himself capable of performing part-time work. He applied at two locations for part-time work but was turned down. Brawner stated that three of the full-time security guard jobs he located for Smith also had part-time work available. It is apparent from the record that at least one of those jobs was located in Jackson. Smith testified that a job in Jackson would entail an approximately sixty mile round trip drive from his house. Notwithstanding Smith's willingness to work part-time, it is improbable that Smith could regularly perform a part-time job given that he is frequently stricken with totally debilitating headaches and he cannot predict when a debilitating headache will occur. Smith has shown himself to be limited by his injury from all but irregular work in which he can set his own pace and duration. Therefore, we find that Smith proved he was permanently, totally disabled. Roling, 226 Miss. at 741, 85 So.2d at 489. We affirm the decision of the circuit court.
¶ 51. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.
NOTES
[1] There is no other reference in the record to an injury occurring on January 12, 1996. UMC admitted that Smith injured his neck while lifting the door in the course of his employment at UMC and did not contend that Dr. Corbett's letter related to a different injury.