ISHEE, J.,
for the Court:
¶ 1. On September 24, 2011, Linda Mitchell sustained a back injury while working for Mississippi State Hudspeth Regional Center (Hudspeth). Mitchell continued working for Hudspeth until she was terminated for cause in June 2012. She did not appeal her termination. On October 19, 2012, Mitchell filed a petition to controvert before the Mississippi Workers’ Compensation Commission in which she alleged disability due to injuries she suffered :on September 24,2011, during the course and scope of her employment on •September 24, 2011. The administrative judge (AJ) awarded Mitchell permanent disability benefits along with medical benefits and penalties. The AJ’s order was affirmed by the Commission. Aggrieved, Hudspeth appeals.
FACTS
¶ 2. Mitchell began working for Hud-speth in ,2003 as a full-time i-egistered nurse supervisor. She was a supervisor for the second shift, which ran from 3 until 11 p.m. However, Mitchell was allowed to complete her forty-hour work week .in three days, so she would arrive at work at 10:30 a.m. two days a week and at 10:15 a.m. one day a week and work fourteen-hour days.
¶ 3. The first time Mitchell suffered an injury at work was in 2009. Mitchell bent down in front of a refrigerator in the medication room to make sure it was stocked with cold drinks. While she was bent over, she felt like she had been “switched ... on [her] lower back.” Even though she did not really think that she was hurt, Mitchell filled out an accident report in accordance with hospital policy. The next morning at 4 a.m., she woke up “with severe, severe slamming pain.” Mitchell was treated by Dr. Michael Winkelmann with injections, and stated that she felt better by the time she left his office. Mitchell did not have any permanent problems after that and was able to return to work.
¶4. On September 24, 2011, Mitchell fell and sustained a more serious back injury. While pulling the medication cart into a patient’s room, she stepped on a slippery substance on. the floor and fell, hitting her buttocks and then her head. She went straight to the emergency room at Baptist Hospital and was told to follow up with Dr. Morris the following Monday. Mitchell saw a number of doctors before being released by Dr. Morris to return to work on November 6,2011.
*620 ¶ 5. Once she returned to her position at Hudspeth, she resumed the same job duties she had prior to her fall. Although she admitted she was struggling, she testified that she “felt like [she] was doing [her] job properly.” She further testified that the fall “completely changed [her] life” and that she no longer has a social life. Mitchell reached maximum medical improvement (MMI) on November 6, 2012, with a 3% permanent partial impairment to the body as a whole.
¶ 6. On May 5, 2012, Mitchell was working and had been assigned to cover two units at Hudspeth. One night just as she walked back into the clinic, her phone rang. It was a lady calling from Dogwood Cottage, one of the two cottages she supervised at Hudspeth, asking her to come look at a patient who she believed had ringworm. Mitchell told the lady that she had just left Dogwood Cottage and that someone would look at it the next day. Mitchell defended her action by stating that since it was a Saturday night without doctors on site she knew she could not do anything without a doctor’s order, and she did not want to call a doctor at that hour on a weekend. Mitchell later admitted, however, that she “should have gone back to the building, and [she] didn’t.”
¶ 7. On June 22, 2012, Mitchell received a letter stating that she was being terminated for cause. The letter cited her refusal to return to Dogwood Cottage on May 5, 2012, and it also stated that Mitchell had been “rude and unprofessional in [her] conversation” on the telephone the evening she was asked to return to Dogwood Cottage. As further support of her termination, the letter cited disciplinary actions that had been taken against Mitchell for excessive tardiness in 2004, 2006, 2007, 2008, and 2009; for failure to obtain her annual TB test in February 2009; for failure to provide medical documentation for sick days she took during holiday periods in 2004, 2006, and 2009; for wrongfully parking in a reserved parking space in 2004; and for failure to chart multiple incidents that occurred in 2003, 2005, 2006, 2007, and 2008. Mitchell testified that she did not appeal the termination because she did not have $100 to pay for the costs of the appeal.
¶8. -In February 2013, Mitchell’s treating physician, Dr. Winkelmann, had Mitchell undergo a two-day functional-capacity evaluation (FCE) with a physical therapist, Angela Cason. After performing the FCE, Cason found that Mitchell “is capable of performing physical work at a [s]ed-entary level ,.. [;][h]owever, based on [the] FCE, [she] would recommend that [Mitchell] not lift weight greater than 20 lbs and 15 lbs overhead.” Mitchell testified that based on the imposed restrictions, she would have been able to continue her duties as a supervisor at Hudspeth, but she would not be able to go back to floor nursing.
¶ 9. After being terminated by Hud-speth, Mitchell searched for other employment. She applied for positions at Behavioral Health, St. Dominic’s Hospital, and River Oaks Hospital. She also talked to a supervisor at Central Mississippi Medical Center (CMMC), but she was not offered any of the positions for which she had applied. Mitchell testified that she would return to Hudspeth if there were any positions available and that “[she] loved it out there.” Mitchell now draws Social Security benefits, and she receives some money from the Public Employees’ Retirement System of Mississippi (PERS). She also applied with PERS for her disability.
¶ 10. In addition to her injury, Mitchell was diagnosed with breast cancer in April 2010. She underwent a right mastectomy in May 2010, and began chemotherapy and radiation following her recovery. The fol *621 lowing year she had a lumpectomy on her left breast. At the time of the hearing in November 2013, Mitchell was still taking the chemo pill, Femara, once daily. She testified that she was cancer-free, but stated that she still suffered from lymphedema from time to time as a result of having her lymph nodes removed.
¶ 11. Following a hearing on April 24, 2014, the AJ issued an opinion in which she found Mitchell to have suffered a “permanent medical impairment because of her September 24, 2011 injury.” In addition to the weight-lifting restrictions, Dr. Wink-elmann also recommended that Mitchell limit standing for extended periods of time, bending forward, and climbing stairs and ladders. The AJ referenced Mitchell’s testimony that she had “bounced back” from her 2009 back injury, and the AJ found that the permanent medical impairment was a result of Mitchell’s fall in 2011. Based on the foregoing, the AJ found that Mitchell was entitled to receive the following:
1. Permanent disability benefits at the rate of $427.20 per week for 450 weeks beginning November 6, 2012[,] with proper credit for compensation paid by [e]mployer/[c]arrier during that period;
2. All medical services and supplies required by the nature of her injury and the process of her recovery as provided in [Mississippi Code Annotated] [s]ection 71-3-15 (Rev.2011) and the [m]edical [f]ee [sjchedule; and
3. A 10% penalty on any untimely paid installments of compensation pursuant to [Mississippi Code Annotated] [section 71-3-37(5) (Rev.2000).
¶ 12. Hudspeth appealed the AJ’s order to the Commission, and the full Commission affirmed the order on November 20, 2014. Aggrieved, Hudspeth appeals.
STANDARD OF REVIEW
¶ 13. When reviewing the decisions of the Commission, this Court employs a limited standard of review. Miss. Loggers Self Insured Fund Inc. v. Andy Kaiser Logging, 992 So.2d 649, 654 (¶ 15) (Miss.Ct.App.2008) (citing Raytheon Aero space Support Servs. v. Miller, 861 So.2d 330, 335 (¶ 9) (Miss.2003)). “The Commission sits as the finder of fact, and it is the ultimate judge of the credibility of the witnesses.” Id. (citing Barber Seafood Inc. v. Smith, 911 So.2d 454, 461 (¶ 27) (Miss.2005)). We will not reverse absent a finding that “the Commission erred as a matter of law or made findings of fact contrary to the overwhelming weight of the evidence.” Smith v. Johnston Tombigbee Furniture Mfg. Co., 43 So.3d 1159, 1164 (¶ 15) (Miss.Ct.App.2010) (citations omitted). “If the Commission’s order is supported by substantial evidence, this Court is bound by the Commission’s determination, even if the evidence would convince us otherwise if we were the fact-finder.” Forrest Gen. Hosp. v. Humphrey, 136 So.3d 468, 471 (¶14) (Miss.Ct.App. 2014) (citation omitted). However, the Commission’s application of the law is reviewed de novo. Miss. Loggers, 992 So.2d at 654 (¶ 15).
DISCUSSION

1. Whether the Commission’s decision is based upon substantial evidence.

¶ 14. Hudspeth argues that the Commission’s findings were not based upon substantial evidence. The Mississippi Supreme Court has defined “substantial evidence” in the following manner:
Substantial evidence means something more than a “mere scintilla” of evidence, and that it does not rise to the level of a preponderance of the evidence. It may *622 be said that it means such relevant evidence as reasonable minds might accept as adequate to support a conclusion. Substantial evidence means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred.
Eaton Corp. v. Brown, 130 So.3d 1131, 1136 (¶ 23) (Miss.Ct.App.2013) (quoting Short v. Wilson Meat House LLC, 36 So.3d 1247, 1250 (¶ 17) (Miss.2010)).
¶ 15. Upon review of the record, we find that there is substantial evidence to support the Commission’s finding that Mitchell suffered a permanent medical impairment as a result of her fall on September 24, 2011. Mitchell was treated by Dr. Winkelmann, who found that she reached MMI on November 6, 2012, with a 3% permanent partial impairment to her body. In addition, the FCE she underwent in February 2013 imposed numerous limitations on Mitchell’s ability to perform any job. Accordingly, this issue is without merit.

2. Whether Mitchell suffered a total loss of wage-earning capacity entitling her to benefits representing a 100% loss.

¶ 16. In order to recover workers’ compensation benefits, the claimant must prove, by preponderance of the evidence, “(1) an accidental injury [occurred], (2) arising out of and in the course of employment, and (3) a causal connection [exists] between the injury and the death or claimed disability.” F & F Constr. v. Holloway, 981 So.2d 329, 332 (¶ 11) (Miss. Ct.App.2008) (quoting Hedge v. Leggett & Platt Inc., 641 So.2d 9, 13 (Miss.1994)). “But, once the claimant makes out a prima facie case of disability, the burden of proof shifts to the employer.” Id.
¶ 17. “[T]he workers’ compensation rules examine ... the likelihood that the marketplace would provide someone in the claimant’s physical condition with the same wages as [s]he had been making before the injury.” Kitchens v. Jerry Vowell Logging, 874 So.2d 456, 468 (¶ 44) (Miss.Ct.App.2004). “If the claimant has been rehired at wages at least as high as before the injury, there is a rebuttable presumption that there is no loss of wage-earning capacity.” Id. (citing Agee v. Bay Springs Forest Prods., Inc., 419 So.2d 188, 189 (Miss.1982)). However, a claimant establishes a prima facie case of disability when she is able to show that “because of the work-related injury, [s]he cannot secure work in the same or other jobs at pre-injury pay.” Univ. of Miss. Med. Ctr. v. Smith, 909 So.2d 1209, 1220 (¶38) (Miss. Ct.App.2005) (citing Ga. Pac. Corp. v. Taplin, 586 So.2d 823, 827 (Miss.1991)). “An employer may rebut the claimant’s prima facie case of disability by showing that the claimant’s effort to find employment was unreasonable or constituted a mere sham.” Id.
¶ 18. As stated above, Mitchell established that she was injured at work and that her injury caused her to suffer a 3% permanent medical impairment rating to her body. In addition, the FCE imposed permanent work restrictions on the physical work she was able to do and the amount of weight she was able to lift. Due to these restrictions, Mitchell was no longer able to perform the duties of a floor nurse, and despite her applications to different hospitals, she was not able to find other employment. We find nothing in the record offered from Hudspeth to rebut this presumption. As such, we agree with the findings of the Commission. This issue is without merit.

3. Whether Mitchell performed an adequate job search.

¶ 19. After being terminated by Hudspeth, Mitchell applied for jobs at St. *623 Dominie’s Hospital, River Oaks Hospital, CMMC, and Behavioral Health. When asked what type of employment she was seeking, Mitchell responded that she “wasn’t specifying what kind, just whatever [she] could get.” However, despite her efforts, Mitchell did not receive any call backs. Hudspeth argues that Mitchell failed to prove that she had made a reasonable search.
¶ 20. “When a claimant has suffered only a permanent partial disability, ‘the claimant bears the burden of making a prima facie showing that he has sought and been unable to find work in the same or other employment.’ ” Pike Cnty. Bd. of Sup’rs v. Varnado, 912 So.2d 477, 482 (¶ 28) (Miss.Ct.App.2005) (quoting Hale v. Ruleville Health Care Ctr., 687 So.2d 1221, 1226 (Miss.1997)). “If the claimant reports back to work at his current employer but the employer refuses to hire him, the claimant has established a prima facie case of total disability.” Id. At that point, the employer then bears the burden- of proving that the claimant suffered no loss of wage-earning capacity or that the claimant only suffered a partial disability. Id. .
¶ 21. Mitchell was terminated on June 22, 2012, but she did not reach MMI until November 6, 2012. The FCE then revealed permanent work restrictions on February 6, 2013; specifically, that Mitchell could only perform physical work at a sedentary level, and that she was no longer able to lift anything greater than twenty pounds, or fifteen pounds overhead. Mitchell submitted job applications to local hospitals, but her search was unsuccessful. Although Hudspeth argues that Mitchell only searched for “high[-]paying jobs rather than seeking employment as a [Registered [n]urse in other nursing positions which paid less,” Mitchell asserts that is not true. Mitchell testified that based on the limitations resulting from her accident, she was no longer able to work as a floor nurse. She testified that she had applied at four facilities for “whatever [work] she could get,” but she had not received any call backs. Based on the foregoing, we find that Mitchell’s job search was, in fact, adequate.
A Whether the AJ’s finding that Mitchell was disabled constituted reversible error.
¶ 22. Finally, Hudspeth argues that the medical proof was insufficient to find Mitchell was disabled, and that in doing so, the AJ committed reversible error. Mississippi Code Annotated section 71-3-3 (Rev.2011) defines disability as the “incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings.”
¶ 23. Again, we look to the appropriate standard of review in this case and find that the findings were supported by substantial evidence. Based on the limitations prescribed by Dr. Winkelmann and the FCE as a result of her fall, Mitchell was limited in which job duties she was able to perform. As a result, she was unable to find other employment and earn the wages that she had received at the time of her injury. We therefore agree with the finding of the Commission that Mitchell is disabled. This issue is also without merit.
¶ 24. THE JUDGMENT OF THE MISSISSIPPI WORKERS’ COMPENSATION COMMISSION IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE, C.J., IRVING, P.J., BARNES AND JAMES, JJ., CONCUR. WILSON, J., DISSENTS WITH SEPARATE *624 WRITTEN OPINION, JOINED BY GRIFFIS, P.J., CARLTON, MAXWELL AND FAIR, JJ. ■