KARR *v.* ARMSTRONG TIRE & RUBBER Co., et al.

Jan. 5, 1953

No. 38581      14 Adv. S. 13      61 So. 2d 789

*Berger & Callon* and *W. A. Geisenberger,* for appellant.

*Butler, Snow & O'Mara,* for appellees.

ROBERDS, P. J.

This is a claim under Section 8 (c) and (21) of the Mississippi Workmen's Compensation Act, Chapter 354, General Laws of Mississippi 1948, amended by Chapter 412, Laws of Mississippi 1950.

It arises under these circumstances: On April 27, 1950, Karr, the appellant, was, and for a number of years prior thereto had been, an employee of appellee, Armstrong Tire & Rubber Company. On said date he was a welder's helper. He and one Welch were endeavoring to repair a hydraulic pump. They were cutting an oil pipe connected to the pump, using for that purpose an electric torch. Oil escaped from the pipe and came in contact with the torch, igniting oil-soaked rags and other debris on the floor near the escaping oil. The two workmen proceeded to put out the fire, using fire extinguishers, one or more of which contained carbon tetrachloride. The contact of that substance with the fire produced a heavy, smoky, gaseous mixture in the room, which covered Karr and which he inhaled, causing painful irritation of his chest,

face and throat. He filed his claim for his wages for four weeks, during which time he was unable to work, and, in addition, for reduced wage-earning capacity resulting from permanent partial loss of use of his voice. The Attorney-Referee, at a hearing held May 7, 1951, allowed compensation for the four weeks he was absent from his work, but disallowed the remainder of the claim. The Commission and the circuit court affirmed the finding and holding of the Attorney-Referee. Karr appealed from that part of the order disallowing the partial permanent disability claim. No appeal was taken by the employer and carrier from allowance of the four weeks wages; therefore, the only question before us is the correctness, upon this record, of the refusal to allow Karr compensation grounded on loss of the use of his voice.

The Attorney-Referee found that the gaseous substance inhaled by Karr was a contributing factor to the loss of his voice. He also found and adjudged " * * * that the disability exhibited by the claimant at the time of the hearing was a percentage equal to eighty percent (80%) inability of the use of the voice, and that the claimant could talk audibly in only a very hoarse whisper—which caused apparent effort on his part, and which he stated was very tiring to him." There is ample testimony to support the stated findings. However, the Attorney-Referee then concluded that the claim, except as to the four weeks actual loss of time, was not compensable, without specifically stating the reason for such conclusion. His order recites that he " * * * finds and adjudges that the permanent disability, if any, suffered by the claimant in this cause is such that (it) is not embraced within that class of disability under the Workmen's Compensation Act of 1948, as amended, that entitles the claimant to recover compensation." That, it is seen, is a conclusion. The fact upon which the conclusion rests is not stated. However, as all parties seem to proceed on the assumption that the nature of the disability was that of

permanent partial disability covered specifically by Section 8 (c) (21) of the Workmen's Compensation Act, the conclusion of the Attorney-Referee that the claim was not compensable must have been grounded upon his belief the applicant had suffered no impairment of wage-earning capacity. But we do not think the facts were sufficiently developed on that phase of the case, and apparently the Attorney-Referee did not give weight to all of the factors entering into that question. It would seem on the face of it that one who had suffered an impairment of eighty percent of his normal voice must of necessity have undergone some impairment of his wage-earning powers. However, we, of course, do not adjudicate that to be a fact in this case. As bearing upon that question the Attorney-Referee had the evidence of claimant. The pertinent part of it is as follows:

"Q. The type of work that you were doing doesn't require you to use your voice power, does it? A. Not too much. You can't work without saying something sometime. Q. Mr. Karr, how do you talk now? Does it require any effort on your part, any unusual exertion to endeavor to increase your voice? Are you conscious that it tires you to talk? A. It doesn't tire me to talk like I'm talking now, but in my line of work if I want to tell anyone anything I have to talk like this (Raising his voice) and it'll tire me. Q. You can talk in what is a very low, hardly audible voice without it tiring you, but if you raise your voice necessary to be heard in ordinary conversation at an ordinary distance from other people it tires you, is that correct? A. Yes, sir."

The Attorney-Referee also had before him the fact that when the injury occurred claimant was earning $45.12 per week working 6 days and at the time of the hearing he was making $60.40 a week working five days at the same employment for the same employer. And that, of course, is strong evidence he had suffered no loss in earning capacity. That comparative actual wage pay, we take it

from the arguments, was the test applied at the hearing to determine whether the earning capacity of applicant had been decreased by the eighty percent impairment in his speech. And some of the authorities seemingly hold that such comparative actual wage pay is the correct and only test. The statutes vary. Our statute does not test the earning capacity by the comparative wages received by applicant before and after the injury. It is not a comparison of actual wage with actual wage. The benefits are figured on a percentage of applicant's average weekly wages at the time of the injury as compared to ''his wage-earning capacity thereafter in the same employment or otherwise * * * .'' Chapter 354, Sec. 8 (c) (21), General Laws of Miss. 1948. In determining the wage-earning capacity of claimant after the injury a number of factors are to be considered in addition to the actual pay received by him when injured as compared to his actual earnings thereafter. Larson has a very good discussion of the elements of proof entering into the question. Vol. 2, Sec. 57.21, page 4:

■■■ ''Degree of disability is calculated under most acts by comparing actual earnings before the injury with earning capacity after the injury.

''It is at once apparent that the two items in the comparison are not quite the same. Actual earnings are a relatively concrete quantity; rules for their measurement, for this purpose and for the general purpose of fixing claimant's benefit level, are set out in a later section. Earning capacity, however, is a more theoretical concept. It obviously does not mean actual earnings, since the Legislature deliberately chose a different phrase for the post-injury earnings factor. Even under those statutes which compare, for example, 'average monthly wages before the accident' with 'the monthly wages he is able to earn thereafter,' the test remains one of capacity. If the Legislature had spoken of the wages 'he has earned thereafter,' or even the wages 'he has been able to earn there-

after,' the comparison of actual wage with actual wage would be indicated. But the concept of wages he 'is able' to earn cannot mean definite actual wages alone, especially in the absence of a fixed period of time within which post-injury wages are to be taken as controlling.

"In essence, the problem is one of tying earnings to a period of time. The relevant period of time for prior earnings can be made relatively short and definite, such as the six months preceding the accident. Once an arbitrary past period is specified as setting the basis for computing an average weekly wage, there can be little argument about what wages were in fact earned. But the relevant period for post-injury earnings melts away into the indefinite future. Obviously we cannot take an arbitrary period of, say, six months after the injury as conclusive, since for a multitude of reasons that period might be entirely nonrepresentative. On the other hand, we cannot wait out the rest of claimant's life to see what his average weekly wage loss ultimately turned out to be, for by then it would be too late for the award to do him any good. An award must be made now and paid now. The only possible solution is to make the best possible estimate of future impairment of earnings, on the strength not only of actual post-injury earnings but of any other available clues.

"It is uniformly held, therefore, without regard to statutory variations in the phrasing of the test, that a finding of disability may stand even when there is evidence of actual post-injury earnings equalling or exceeding those received before the accident. The position may be best summarized by saying that actual post-injury earnings will create a presumption of earning capacity commensurate with them, but the presumption may be rebutted by evidence independently showing incapacity or explaining away the post-injury earnings as an unreliable basis for estimating capacity. Unreliability of post-injury earnings may be due to a number of things: in-

crease in general wage levels since the time of accident; claimant's own greater maturity or training; longer hours worked by claimant after the accident; payment of wages disproportionate to capacity out of sympathy to claimant; and the temporary and unpredictable character of post-injury earnings.

"The ultimate objective of the disability test is, by discounting these variables, to determine the wage that would have been paid in the open labor market under normal employment conditions to claimant as injured, taking wage levels, hours of work, and claimant's age and state of training as of exactly the same period used for calculating actual wages earned before the injury. Only by the elimination of all variables except the injury itself can a reasonably accurate estimate be made of the impairment of earning capacity to be attributed to that injury."

There was no proof on a number of these elements. For instance, it is not shown whether the increase in wages being paid claimant at the time of the hearing, as compared to his wages at the time of the injury, was the result of a general rise in wage scales, or was influenced by sympathy of the employer for the injured employee, or the result of enlarged experience of the applicant. A general discussion of the factors entering into this question, taken from cited cases, will be found in the annotation in 149 A. L. R. beginning at page 413. Everything considered we believe that justice requires that this matter be reconsidered. By this we do not mean to adjudicate, or intimate, what the result of another hearing should be.

Reversed and remanded.

*Hall, Kyle, Arrington* and *Ethridge, JJ.*, concur.