# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-WC-00552-COA

**MARSHA S. PARKER**                              **APPELLANT**

**v.**

**MISSISSIPPI DEPARTMENT OF HEALTH AND**         **APPELLEES**
**MISSISSIPPI STATE AGENCIES WORKERS'**
**COMPENSATION TRUST**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/26/2022 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEYS FOR APPELLANT: | JAMES KENNETH WETZEL<br>GARNER JAMES WETZEL |
| ATTORNEY FOR APPELLEES: | GINGER MOORE ROBEY |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | AFFIRMED - 03/28/2023 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**CARLTON, P.J., FOR THE COURT**:

¶1. Marsha Parker was employed as an oral health consultant by the Mississippi Department of Health (MDH) when she tripped and fell at a job location on July 6, 2017. She sustained admitted work-related injuries involving her neck, back, and right wrist. Parker subsequently claimed that she injured her right shoulder during her November 2017 functional capacity exam (FCE) for her initial injuries. She appeals two rulings the Mississippi Workers' Compensation Commission (Commission) made in two orders, asserting that the Commission erred (1) in determining that she did not suffer a compensable right-shoulder injury and (2) in finding that her compensable injuries had diminished her

wage-earning capacity by only 15%. Under our deferential standard of review that applies here, we find that both rulings are supported by substantial evidence and are neither arbitrary nor capricious. Accordingly, we affirm the rulings of the Commission made in these two orders.

## PROCEDURAL HISTORY AND STATEMENT OF FACTS

¶2. Parker tripped on a broken floor tile at her work site on July 6, 2017. She filed a petition to controvert with the Commission on January 23, 2018. MDH and its workers' compensation carrier (collectively, MDH) admitted that an injury had been sustained and that Parker had been performing a service within the course of her employment at the time.

### I. The Evidentiary Hearing

¶3. On July 17, 2019, an evidentiary hearing was held by the Administrative Judge (AJ) to address two disputed issues arising in this case: (1) the compensability of an alleged right-shoulder injury that Parker said occurred during her FCE, which MDH contested and (2) the nature and extent of Parker's permanent disability, if any, attributable to her admitted work-related injuries involving her neck, back, and right wrist that occurred on July 6, 2017.

### A. Live Testimony

¶4. Parker testified at the July 17, 2019 evidentiary hearing before the AJ. Dr. Angela Filzen, the Director of Oral Health for MDH and Parker's supervisor, also testified at the evidentiary hearing, as well as Ty Pennington, a certified rehabilitation counselor with Rehabilitation Inc., who testified as a vocational expert on behalf of MDH.

2

### 1. Parker

¶5. Parker was sixty-one years old at the time of the hearing. She graduated high school and later obtained a cosmetology degree, an associate degree, and then a bachelor of science degree in dental hygiene in 2013. She worked in cosmetology before beginning her career in the dental field. With respect to her dental-field experience, Parker initially worked as a dental office administrator before becoming a dental hygienist in a private practice. She is licensed to practice as a dental hygienist in Mississippi.

¶6. In 2008, MDH hired Parker in a contract position as a regional oral health consultant. Parker testified that in that position, her pre-injury job duties included performing oral health screenings for children, presenting at health fairs, and aiding dentists in applying sealants on school-aged children's teeth to prevent dental disease. As for physical requirements, Parker testified that she occasionally would have to set up portable dental equipment when she presented at health fairs. She testified that the heaviest piece of equipment she would have to transport was a compressor that she believed weighed over forty pounds. Parker testified that she worked as many as forty hours per week but sometimes less, noting that she did not work much during the year before her injury because she was caring for her sick mother. Parker was free to set her own schedule. She earned $25 per hour.

¶7. On the date she was injured, July 6, 2017, Parker was at the Boys and Girls Club of Biloxi providing dental-care evaluations and examinations for children. As she was walking out of the gymnasium, she tripped over a broken floor tile and landed on her right wrist and

3

right hip. She testified that the fall caused injuries to her lower back, neck, knees, and right wrist. She told her supervisor, Dr. Filzen, about the accident and went to Garden Park Hospital in Gulfport, where she was evaluated and discharged. She returned to Garden Park again a few days later and was given a referral to see Dr. George Salloum at Bienville Orthopedic for further evaluation of her wrist pain. Parker testified that Dr. Salloum treated her for her wrist injury and ordered physical therapy, which helped with her range of motion and pain. She testified that she continues to have trouble with repetitive motion involving her wrist but has not sought further treatment.

¶8. Parker was subsequently referred to Dr. Eric Graham for an evaluation of her neck and back pain. Dr. Graham referred her for MRIs and later recommended cervical spine surgery, which Parker admitted she declined. Dr. Graham then referred her to another doctor for pain management, but no treatment was ever administered due to Parker's unrelated ulcer condition.

¶9. In the fall of 2017, Dr. Graham recommended Parker for a two-day FCE[1] that was performed by Doug Roll, a physical therapist with Physical Therapy Center of Biloxi, to determine any permanent work restrictions. Parker testified that on the first day of the FCE (November 27, 2017), she was lifting a box overhead, and it "came back down on me."

---

[1] Roll described an FCE as a test designed to "gather information as to the injured worker's ability to perform specified functional tasks, like lifting, carrying, pushing, pulling . . . as related to their job requirements and then to make recommendations to the referring physician on whether . . . they can return to that occupation or not."

4

According to Parker, when she tried to catch it, she injured her right shoulder. She testified that she told the physical therapist (Roll) that she injured herself, but he said she had to do it. Parker described how she was "hurting so bad and crying [, and] I just said I have to leave." Parker did not return to the clinic for the second day of the FCE. When the clinic called her, she told them that she just could not physically do the exam and that she was hurting.

¶10. After the first (uncompleted) FCE, Dr. Graham referred Parker for a second FCE at Coastal Rehabilitation in March 2018. This FCE was performed by Joseph Frame, a physical therapist. Parker successfully completed the second FCE.

¶11. Parker returned to Dr. Graham in May 2018, and was released to return to work with lifting restrictions based on the FCE Frame had administered. Parker then saw Dr. Salloum in August 2018 complaining of right shoulder pain. She later testified that she related the pain to "an accident at the functional capacity test." Parker testified that Dr. Salloum diagnosed her with a partial thickness tear of the rotator cuff and ordered surgery.[2] Parker has since sought chiropractic treatment with Dr. Anthony Lopez through her personal insurance.

¶12. Although Parker was not able to recall specific details, she admitted that she had right shoulder problems before the FCE, stating that she had had an injection sometime around

---

[2] MDH contested compensability for the alleged right-shoulder injury and did not authorize the surgery.

2014. She testified that she did not recall being diagnosed with a torn rotator cuff; however, on cross-examination, Parker admitted that Dr. Salloum's records and an MRI from 2010 showed she was diagnosed with and treated for a partial thickness tear to her right-shoulder rotator cuff.[3] She also recalled on cross-examination that Dr. Salloum treated her for her shoulder issue, but she said that she did not remember telling him that her symptoms were related to a prior car accident that was documented in Dr. Salloum's records. Parker did recall using a TENS unit for her shoulder pain in 2010.

¶13.    Parker was released to return to work in May 2018; however, she did not return to work until February 2019. She has been working since then, but she acknowledged that she does the educational aspects of the job, which do not involve lifting any equipment, though she has done some screening involving the use of equipment called a portable compressor. She believed that it weighed less than fifty pounds.

¶14.    Parker confirmed that she can choose when she wants to work (subject to a 200-hundred-hour monthly cap), but she claims that she does not work the same number of hours that she did before her 2017 injuries because she is not able. She makes the same hourly wage, and during questioning, Parker confirmed that her employer has told her that she is not required to lift anything that makes her feel uncomfortable. She is now working ten-to-twelve hours per week. She has not looked for other employment.

_____

[3] The 2010 MRI results of Parker's right shoulder specifically provide that "[t]here is a near full thickness rim rent tear of the rotator cuff at the junction of the supraspinatus and infraspinatus tendons. This undersurface tear is approximately 90%."

## 2. Dr. Filzen

¶15. Dr. Filzen, Parker's supervisor, testified that Parker is one of six regional contract consultants serving in Mississippi. Region 7, where Parker works, is the only region that has two consultants due to the size and population of the coastal region. Parker and her co-consultant work together as a team, and each can work a maximum of 200 hours per month, which is set by federal grant guidelines. The consultants are paid $25 per hour.

¶16. Regarding the hours Parker worked, Dr. Filzen confirmed that Parker is free to set her schedule. Parker does not have a minimum number of hours she has to work each week or month, just as she was allowed to do before her injuries. Dr. Filzen was not aware that Parker had been released to return to work before Parker contacted her in December 2018, nor had Dr. Filzen ever been presented with a doctor's note limiting the number of hours Parker can work. The only restriction that Parker provided her was the second FCE report. Dr. Filzen agreed that if Parker is only working twelve hours per week, then that is because Parker is opting to do so. She confirmed that Parker could have returned to her position with whatever accommodation she needed at any point upon her reaching maximum medical improvement (MMI).

¶17. During her testimony, Dr. Filzen also confirmed that for screenings, the largest piece of dental equipment that Parker may need to carry was the compressor; Dr. Filzen had it weighed, and it weighed less than fifty pounds. None of the educational materials Parker might need to carry weighed more than fifty pounds. Dr. Filzen agreed that no restrictions

in the FCE prevent Parker from performing the job duties that she was performing before the injuries. Parker remains employed, and her hourly rate remains the same.

### 3. Ty Pennington

¶18. Pennington testified as a vocational expert on behalf of MDH. Pennington had met with Dr. Filzen and was familiar with the daily physical requirements of an oral health consultant. He testified that although there is occasional lifting required in that position, none appeared to be repetitive. Pennington also weighed all of Parker's portable dental equipment and confirmed that none of the equipment weighed more than fifty pounds. All the equipment fell within Parker's lifting limitations. After having discussed the job duties of an oral health consultant with Dr. Filzen and weighing the equipment, Pennington was of the opinion that nothing in Parker's daily duties exceeded her restrictions set forth in her FCE.

¶19. Additionally, Pennington testified about Parker's employment prospects in the open labor market. He testified that the position of dental hygienist, for which Parker has prior employment experience, is classified as a light-duty position with occasional lifting up to only twenty pounds. Were Parker to seek employment as a dental hygienist in the private sector, the physical requirements for this job would be well within her lifting restrictions and actually less physically demanding than her oral-health-consultant position with MDH. According to the labor market study he conducted, an entry-level dental hygienist could expect to earn $47,000 per year, and an experienced hygienist could expect a salary of up to

8

$69,000 per year. He testified that based on Parker's education and prior work experience, she would be considered an experienced dental hygienist. Parker, therefore, has the potential to earn $69,000 per year, performing less strenuous work in a clinical setting.

**B.     Medical Evidence and Related Exhibits Entered into Evidence**

¶20.    The following exhibits were also entered into evidence at the hearing: the medical records of Dr. Salloum, Dr. Graham, Dr. Henry Leis, and Dr. John Davis IV; the deposition of the physical therapist Doug Roll, who conducted Parker's first (uncompleted) FCE; the medical records of Dr. Hanna Mitias, who performed an employer's medical evaluation of Parker; and the first and second FCE reports prepared by Roll and Frame, respectively.

**1.     Dr. George Salloum**

¶21.    Dr. Salloum evaluated Parker on July 11, 2017 (five days after the fall at work). Parker was complaining of pain in her right wrist, neck, left shoulder, back, and right hip, though Dr. Salloum only provided treatment for her right wrist. An MRI of Parker's right wrist was obtained on July 24, 2017, revealing a microfracture and sprain. Dr. Salloum ordered physical therapy, and he also injected Parker's knee. MRIs of her cervical and lumbar spine were obtained, and on August 31, 2017, Dr. Salloum referred Parker to Dr. Graham for further evaluation of her neck and back.

¶22.    Parker did not return to Dr. Salloum until nearly a year later, on August 3, 2018. Parker reported a right shoulder injury that she said happened at an FCE "on date unknown,"

but it had been "a few months since the injury."[4]  At that time, Dr. Salloum diagnosed Parker with subacromial bursitis, a rotator cuff tear, and impingement syndrome of the right shoulder.  He did not address causal relation.  An MRI of Parker's right shoulder dated August 13, 2018, revealed a partial thickness tear of the supraspinatus tendon, mild osteoarthritis, mild bursitis, mild tendinosis, and chronic SLAP tear.[5]  Dr. Salloum ordered therapy and later recommended surgery.

¶23.  Dr. Salloum's records also show that he had previously treated Parker in 2010.  Those records indicate that Parker had sustained a right shoulder injury in a motor vehicle accident.  An MRI from October 2010 revealed a Compass-type III acromion tear of the supraspinatus and infraspinatus, as well as a subchondral cyst of the humeral head.  In December 2010, Parker was diagnosed with right-shoulder impingement syndrome and a partial thickness tear of the rotator cuff.  Dr. Salloum's notes provided that if Parker did not improve, then surgery

---

[4] For reference, we note that the date of the FCE was November 27, 2017—nearly a year before Parker's office visit with Dr. Salloum.  His progress note provides that Parker "reports for the initial evaluation of pain and an injury located in the right shoulder."  Parker told him that "she was doing her functional capacity exam when she told [the] therapist she couldn't hold box above her head, the box fell on her shoulder. She reports the pain has an aching quality."  The "Physical Examination" portion of the progress note provides that Parker "injured her shoulder when she was in physical therapy and a box shifted. She states she was hit in the face and the eye along with having significant pain in the right shoulder. Her symptoms are consistent with subacromial bursitis."

[5] A SLAP tear is an anterior-to-posterior tear to the top (superior) of the glenoid labrum, a type of cartilage found in the shoulder joint.  Cleveland Clinic, Diseases & Conditions, https://my.clevelandclinic.org/health/diseases/21717-slap-tear (last visited Mar. 24, 2023).

may be necessary.[6]

### 2. Dr. Eric Graham

¶24. Dr. Eric Graham initially evaluated Parker on September 22, 2017, following her July 2017 work injuries. Dr. Graham diagnosed Parker with cervical stenosis, an L5-S1 disc herniation, osteoarthritis of the cervical spine with radiculopathy, and lumbar facet degeneration. Parker expressed a desire to avoid surgical intervention, so Dr. Graham issued a pain management referral and ordered a two-day FCE.

¶25. Parker returned to Dr. Graham on January 9, 2018, to review the FCE report. Dr. Graham noted that Parker "reports that she injured her shoulder removing a box from an overhead position. Because [of] the pain[,] she was unable to complete the [second day of the FCE] test." Parker was sent for a second FCE with Frame. The second FCE took place on March 13, 2018. Parker returned to Dr. Graham on May 1, 2018, to discuss the results. Dr. Graham adopted the findings from the March 13, 2018 FCE and placed Parker at MMI as of May 2018. Dr. Graham assigned Parker a 7% impairment rating for the lumbar injury and a 19% rating for her cervical injury.

### 3. Dr. John Davis IV

---

[6] The medical records of Dr. Leis show that he treated Parker in 2014 for chronic and persistent low back and left hip pain following a motor vehicle accident in 1998. Dr. Leis diagnosed her with a lumbar back sprain with radiculopathy (pinching of the nerves) and administered a lumbar epidural steroid injection. An August 2014 MRI revealed a disc bulge at the C4-C5 levels, a disc protrusion at the L4-L5 levels, an annular tear at T-2, and a Schmorl's node at L1.

11

¶26. Dr. John Davis IV, a neurosurgeon, performed an employer medical evaluation of Parker on May 4, 2018, for her cervical and lumbar complaints. Dr. Davis opined Parker was not a surgical candidate based on her cervical complaints and stated that she would need to be evaluated by a physical medicine physician for an impairment rating. Regarding the lumbar injury, Dr. Davis believed that Parker's left-sided S1 radicular pain was causally related to her work injury and recommended a series of epidural steroid injections.

### 4. Doug Roll

¶27. Doug Roll's deposition was entered as an exhibit at the hearing. Roll is licensed as a physical therapist in Mississippi and is board certified in orthopaedics. He testified that Parker was referred to him by Dr. Graham for a two-day FCE following work-related injuries to her neck and back. The exam began on November 27, 2017. Parker performed a series of lifting activities, but according to Roll, his records reflected that she made no mention of injuring her right shoulder during the course of those exercises. He was read Parker's deposition testimony in which she had said that while lifting a heavy box onto an overhead shelf, the box fell onto her face and shoulder. Roll testified that if that incident had occurred, as Parker testified, then he would have documented it in his report. He further testified that if Parker would have reported shoulder pain during the FCE, then he would have documented those complaints as well. Neither Roll's notes nor his report contained any documentation of this information. Rather, Roll's report documented that she lifted only fifteen pounds and that it was "safe and controlled." This was the maximum amount of weight she would even

attempt to lift during the FCE, refusing to progress beyond that. Roll also testified that Parker was not asked to lift a box overhead; rather, "the overhead task . . . is . . . she's lifting the box up, her hands go to about crown level or to the top of her head. Not all the way overhead with the arms and elbows fully extended. . . ." Roll confirmed that he observed Parker during the FCE in its entirety, except during breaks. Contrary to Parker's testimony, Roll had no recollection that she "begged and pleaded" with him to stop making her lift the box, and his report did not reflect this information. He explained that typically he would record a reaction that severe.

¶28. Roll also pointed out that an objective data point is that if a patient is in severe pain, the heart rate elevates. In Parker's case, her heart rate was 81 during the test and approximately 80 during the initial musculoskeletal assessment. This lack of a heart-rate elevation was an objective indication that the test did not cause severe pain. Roll could not substantiate any alleged injury to Parker's right shoulder during the FCE.

### 5. Dr. Hanna Mitias

¶29. Dr. Hanna Mitias performed an employer's medical evaluation on October 16, 2018. He stated that he reviewed the depositions of Parker and Roll, and he could not find a correlation where Parker would have torn her rotator cuff doing the lifting (in the FCE), further pointing out that Parker was able to complete her FCE at a later date. He also compared Parker's October 2010 MRI to the 2018 MRI, and both showed a partial tear of the supraspinatus. The 2018 MRI showed the tear had "simply extended" and was still

13

partial. He described this as a chronic-type condition. He stated that if Parker continued to be symptomatic, then he would recommend arthroscopy, but it would need to be done through her private insurance. With regard to MMI and permanent-partial impairment (PPI), he stated that because it is not a work-related injury, there was no need to address those issues.

### 6. The FCE Reports

¶30. Both FCE reports were entered into evidence. The report from the November 27, 2017 FCE with Roll confirmed that Parker only presented for the first day of the two-day evaluation. The report indicates that Parker was self-limiting with her efforts and demonstrated symptom magnification. The report further provided, "Client did not attend day 2 of the functional capacities evaluation due to her report of increased pain." A call log noted, "called pt. and she stated that she was too sore to come to appointment. She cannot move." There was no mention of any injury to Parker's shoulder having occurred.

¶31. Frame performed the second FCE on March 12, 2018. The report indicates Parker "gave good effort throughout the testing procedures," and her score of one out of five on Waddell's test for nonorganic pain behavior indicated "a low probability of symptom magnification." The report further provided that Parker displayed the ability to work within a medium level of work, with specific lifting limitations being outlined in the report.

### II. Post-Evidentiary Hearing

¶32. Following the evidentiary hearing, the AJ entered an order on May 11, 2020, finding

(1) Parker had sustained a compensable right-shoulder injury while participating in an FCE and (2) Parker had sustained a 50% loss of wage-earning capacity, which would entitle her to permanent partial indemnity benefits in the amount of $263.13 per week for 450 weeks.

¶33.   MDH appealed the AJ's ruling to the Commission, asserting that the AJ's findings were contrary to the overwhelming weight of the evidence and that the AJ's order was contrary to the applicable law.

¶34.   The Commission entered an order reversing in part and vacating the AJ's order and remanding the case on December 4, 2020.  In doing so, the Commission found that (1) Parker did not establish that she had suffered a compensable right-shoulder injury and that (2) based on the evidence as a whole, there existed a legal rebuttable presumption of no loss of wage-earning capacity.[7]  The Commission remanded the case to the AJ to determine whether Parker had rebutted the presumption and, if so, for a determination of her loss of wage-earning capacity, if any.

¶35.   The AJ entered a second order on December 3, 2021, concluding Parker had rebutted the legal presumption of no loss of wage-earning capacity and again finding that Parker had sustained a 50% loss of wage-earning capacity.

¶36.   MDH appealed the AJ's second order, asserting that the determination of a 50% loss

---

[7] One Commissioner filed a concurrence in part and dissent in part to the Commission's December 4, 2020 order.  She agreed that the case should be remanded so that Parker could be permitted to rebut the presumption of no loss of wage-earning capacity, but she disagreed with the full Commission's determination that the right shoulder injury was not compensable.

15

of wage-earning capacity was contrary to the overwhelming weight of the evidence. The Commission agreed, entering its second and final order on May 26, 2022, and finding that Parker had sustained only a 15% loss of wage-earning capacity as a result of her compensable work-related injuries.

¶37. Parker appeals (1) the Commission's December 4, 2020 ruling that she did not sustain a compensable right-shoulder injury and (2) the Commission's May 26, 2022 determination that she had sustained a 15% loss of wage-earning capacity, as described above.

## STANDARD OF REVIEW

¶38. "The Commission is the ultimate fact-finder in a workers' compensation case, and 'decisions by the Commission on issues of fact and credibility' must be given deference." *Kroger Co. v. Pybus*, 327 So. 3d 678, 683 (¶15) (Miss. Ct. App. 2021) (quoting *Imperial Palace Casino v. Wilson*, 960 So. 2d 549, 552 (¶9) (Miss. Ct. App. 2006)). To this end, "[b]ecause the Commission is the ultimate fact-finder and judge of the credibility of the witnesses, this Court may not reweigh the evidence before the Commission." *Curry v. Ashley Furniture Indus.*, 296 So. 3d 193, 197 (¶13) (Miss. Ct. App. 2020) (quoting *Gregg v. Natchez Trace Elec. Power Ass'n*, 64 So. 3d 473, 475 (¶8) (Miss. 2011)). As such, reversal is proper only when the Commission's decision "lacks the support of substantial evidence, is arbitrary or capricious, is beyond the Commission's scope or its power, or violates constitutional or statutory rights." *Kroger*, 327 So. 3d at 683 (¶15) (quoting *Seals*

16

*v. Pearl River Resort*, 301 So. 3d 585, 587 (¶5) (Miss. 2020)).[8]

¶39.    "For a decision to be supported by substantial evidence, the underlying evidence must provide a substantial basis of fact from which the fact in issue can be reasonably inferred." *Seals*, 301 So. 3d at 587-88 (¶5) (internal quotation marks omitted). "Therefore, if a decision is supported by substantial evidence, it will almost necessarily not be arbitrary or capricious." *Id.*

¶40.    Parker urges this Court to reverse the Commission's rulings and adopt the AJ's findings on the issues on appeal. We remind Parker of "the well-settled proposition that 'the law in this State is that the Commission, not the [AJ], is the ultimate fact-finder.'" *Weathersby v. Miss. Baptist Health Sys. Inc.*, 195 So. 3d 877, 883 (¶23) (Miss. Ct. App. 2016) (quoting *Smith v. Jackson Constr. Co.*, 607 So. 2d 1119, 1123 (Miss. 1992)). Thus, this Court will "apply a general deferential standard of review to the Commission's findings and decisions despite the actions of the [AJ]." *Id.* (quoting *Smith*, 607 So. 2d at 1123-24). The law provides that "once the Commission has ruled, the AJ's 'decision becomes moot.'" *Id.* (quoting *Sterling v. Eaton Corp.*, 109 So. 3d 1096, 1101 (¶16) (Miss. Ct. App. 2013)).

## DISCUSSION

### I.    Parker's Right Shoulder Injury

¶41.    Parker asserts that she suffered a compensable right-shoulder injury (rotator cuff tear)

---

[8] Parker does not assert that the Commission violated her statutory or constitutional rights or exceeded its power, so our review is limited to whether substantial evidence supports the Commission's decision.

17

while performing a lifting exercise during her first FCE on November 27, 2017. She asserts that the Commission's ruling on this issue should be reversed. We disagree. As addressed below, we find that the Commission's finding that Parker did not sustain a compensable right-shoulder injury is supported by substantial evidence. Accordingly, we affirm this ruling.

¶42. Pursuant to Mississippi Code Annotated section 71-3-7(1) (Supp. 2012), "[c]ompensation shall be payable [to an employee] for disability . . . from injury . . . arising out of and in the course of employment, without regard to fault as to the cause of the injury . . . ." As defined in section 71-3-3(i) (Rev. 2011), "'[d]isability' means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings." *See also Howard Indus. v. Robinson*, 846 So. 2d 245, 252 (¶17) (Miss. Ct. App. 2002) (recognizing that a "claim of disability must be supported by medical findings" (citing § 71-3-3(i))). The claimant (Parker) bears the burden of proving "the disability and its extent," including the existence of an "an actual physical injury." *Gregg*, 64 So. 3d at 476 (¶¶10-11).

¶43. Further, "[u]nless common knowledge suffices, medical evidence must prove not only the existence of a disability but also its causal connection to employment." *Robinson*, 846 So. 2d at 259 (¶49). "In all but the simple and routine cases . . . it is necessary to establish medical causation by expert testimony." *Cole v. Superior Coach Corp.*, 234 Miss. 287, 291,

18

106 So. 2d 71, 72 (1958). We agree with the Commission that given Parker's prior medical history concerning her right shoulder, her claim does not constitute a "simple and routine" case on the issue of medical causation, *id.*, nor is it such a case in which "common knowledge [would] suffice[]" in proving a causal connection between the right shoulder injury and Parker's FCE. *Robinson*, 846 So. 2d at 259 (¶49).

¶44. Parker claims she injured her right shoulder during the first day of the FCE conducted by Roll on November 27, 2017. The Commission acknowledged her version of the occurrence in its order and also recognized that Parker reported a medical history to Dr. Salloum and Dr. Graham that she had injured her shoulder during her FCE exam. Parker did not see Dr. Salloum until nine months after the November 27, 2017 FCE. And Parker's January 2018 appointment with Dr. Graham was to review her first FCE results. There is no indication in the record that Parker visited Dr. Graham because of a purported shoulder injury. Further, the Commission specifically observed that "[Parker] . . . failed to present at the hearing a medical opinion in support of causation. Given [Parker's] long history of preexisting shoulder problems, this is far from a 'simple and routine case[]' on the issue of medical causation." *See Cole*, 234 Miss. at 291, 106 So. 2d at 72. As such, the Commission found that "[Parker] has failed to establish by competent medical evidence that her alleged shoulder injury is a result of [her] participation in the FCE."

¶45. Indeed, the medical records show that Parker had been diagnosed with a partial right rotator cuff tear in 2010, with similar findings in the 2018 MRI. As reflected in Dr. Mitias's

19

employer's medical evaluation, the 2018 MRI of Parker's right shoulder showed that the tear had extended but was still partial, which would indicate that the tear was the result of a chronic condition rather than an acute injury. Dr. Matias also opined, "I do not believe that [Parker's] shoulder complaints are causally related to lifting tasks. . . . I cannot find the correlation where she would have torn her rotator cuff doing the lifting." The Commission found "the opinion of Dr. Mitias to be of greater weight in medical evidence than the records reflecting the patient's history of the injury," and we find no error in this determination. *See Washington v. Woodland Vill. Nursing Home*, 25 So. 3d 341, 355 (¶33) (Miss. Ct. App. 2009) ("'Where there is conflicting medical testimony, the Commission has the responsibility to apply its expertise and determine which evidence is more credible.'" (quoting *Wesson v. Fred's Inc.*, 811 So. 2d 464, 469 (¶23) (Miss. Ct. App. 2002))).

¶46.    Further, as the Commission found in its order, Roll's deposition testimony, notes, and report contradict, and certainly do not substantiate, Parker's version of the events purportedly causing the shoulder injury. Roll had no independent recollection of Parker's FCE, and neither his report nor his notes contain any indication that Parker mentioned injuring her right shoulder during the exercises conducted in administering the FCE. Roll testified that if an incident had occurred as Parker described, he would have documented it in his report and notes. He confirmed that he observed Parker during the FCE in its entirety, except during breaks. Roll also disputed that she performed the lifting exercise in the manner that she alleged.

20

¶47. Additionally, Roll pointed out that typically, if a patient is in severe pain, the heart rate elevates—but that did not occur in Parker's case. Her heart rate was 81 during the test and approximately 80 during the initial musculoskeletal assessment. Although Roll's records indicate that when the clinic called Parker the next day, she said she was "too sore" to come for the second day of the FCE, there is no mention of shoulder pain. Roll's report also provides that Parker "demonstrated symptom magnifying and self-limiting behaviors during the [first day of] the testing procedure."

¶48. In sum, the Commission found that Parker failed to satisfy her burden of proof regarding the compensability of the alleged right-shoulder injury and denied her claim for workers' compensation benefits with respect to that injury. As the basis for its decision, the Commission pointed to Parker's lack of medical evidence to support a causal relationship, as well as the medical evidence of Parker's pre-existing shoulder problems, Dr. Mitias's medical evaluation and opinion that Parker's right shoulder complaints are not causally related to exercises performed at the FCE, and Roll's deposition testimony about the first (uncompleted) FCE. Because we find the Commission's determination that Parker did not prove she suffered a compensable right-shoulder injury was based on substantial evidence, we affirm the ruling.

## II. Loss of Wage-Earning Capacity Due to Parker's Admitted Work-Related Injuries

¶49. Parker asserts that the Commission erred in finding that she sustained only a 15% loss of wage-earning capacity due to her admitted work-related injuries on July 6, 2017. She

21

asserts that this Court should adopt the AJ's findings and determination that she sustained a 50% loss of wage-earning capacity. We disagree.

¶50.    First, it bears repeating that "the law in this State is that the Commission, not the AJ, is the ultimate fact-finder.'" *Weathersby*, 195 So. 3d at 883 (¶23). The AJ's decision is moot once the Commission has ruled. *Id.* We find that the Commission's conclusion that Parker suffered a 15% loss of wage-earning capacity as a result of her compensable work-related injuries is supported by substantial evidence. We therefore affirm this ruling.

¶51.    As addressed above, "disability" is defined under the Workers' Compensation Act as an employee's "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment." Miss. Code Ann. § 71-3-3(i). An employee's "incapacity and the extent thereof must be supported by medical findings." *Id.* Parker, as the claimant, must prove "disability and its extent" by showing that there was "(1) an actual physical injury; and (2) [a] loss of wage-earning capacity." *Gregg*, 64 So. 3d at 476 (¶¶10-11).

¶52.    Benefits are determined by a percentage "of the difference between [an employee's] average weekly wages, subject to the maximum limitations . . . and [the employee's] wage-earning capacity thereafter in the same employment or otherwise." Miss. Code Ann. § 71-3-17(c)(25) (Supp. 2012). "A rebuttable presumption of no loss of wage-earning capacity arises when the claimant's post-injury wages are equal to or exceed his preinjury wage." *Gregg*, 64 So. 3d at 476 (¶12). In this case, the Commission applied the legal

22

presumption of no wage loss and found that Parker offered sufficient evidence to rebut the presumption.

¶53. Regarding a determination of a claimant's post-injury loss of wage-earning capacity, "[t]he Commission's objective . . . is to 'determine the wage that would have been paid in the open labor market under normal employment conditions to [the] claimant as injured.'" *Tew v. Siemens Power Transmission*, 156 So. 3d 329, 332 (¶11) (Miss. Ct. App. 2010) (quoting *Karr v. Armstrong Tire & Rubber Co.*, 216 Miss. 132, 139, 61 So. 2d 789, 792 (1953)). "There are a number of factors the Commission should use to aid it in determining wage-earning capacity." *Id.* These factors include:

> (1) an increase in general wage levels, (2) increased maturity or training, (3) longer hours worked, (4) sympathy wages, (5) temporary and unpredictable character of post-injury earnings, (6) employee's inability to work, (7) employee's failure to be hired elsewhere, and (8) the continuance of pain and other related circumstances.

*Id.* (quoting *Richards v. Harrah's Entm't Inc.*, 881 So. 2d 329, 332 (¶7) (Miss. Ct. App. 2004)). "The determination must be made by evaluating the evidence as a whole." *Id.*

¶54. In this case, the Commission found that "[b]ased on the evidence as a whole, including but not limited to [Parker's] ability to earn wages on the open labor market, her permanent restrictions, medium level work duty release, her subjective complaints of ongoing pain, and [Parker's] current wages," Parker "suffered a 15% loss of wage-earning capacity due to her admitted injur[ies]." We find that substantial evidence supports the Commission's determination on this issue.

¶55. Parker contends that her wage-earning capacity has been diminished by 50%, pointing to the impairment ratings assigned to her (7% to her lumbar spine and 19% to her cervical spine), her continued pain, and the fact that she is earning less money post-injury. Regarding Parker's impairment ratings, we find persuasive the Mississippi Supreme Court's explanation in *Robinson v. Packard Electric Division General Motors Corporation*, 523 So. 2d 329 (Miss. 1988), that "a claimant who has suffered a functional/medical disability of 15% may have no industrial disability [(i.e., loss of wage-earning capacity)] at all if the functional impairment does not impede the claimant's ability to perform the duties of employment." *Weathersby*, 195 So. 3d at 884-85 (¶30) (quoting *Robinson*, 523 So. 2d at 331).

¶56. Under the same analysis, we find that the loss of wage-earning capacity may be minimal, as is the case here. The Commission took into account the factors Parker relies upon in claiming a 50% loss of wage-earning capacity, but the Commission found that Parker's limitations only minimally impacted her "ability to perform the duties of her employment," and her loss of wage-earning capacity. As the Commission pointed out in its May 26, 2022 order, Parker returned to her pre-injury position, earning the same hourly wage. The Commission further observed that Parker "has not presented a medical opinion that restricts the number of hours per week that she [can] work[] due to her injury, and [her supervisor] testified that if [Parker] elected to work more hours, she can do so."

¶57. In particular, the record reflects that Parker has no medical restrictions that prevent her from fulfilling the requirements of her position as an oral health consultant for the State.

24

Upon reaching MMI for her work-related injuries, her treating physician Dr. Graham released her to return to work in May 2018 with a permanent lifting restriction of fifty pounds as delineated in the second FCE.[9]  Both Dr. Filzen, Parker's supervisor, and Ty Pennington, the vocational expert, confirmed that the limitations set forth in the FCE would not prevent Parker from performing the duties of her pre-injury position.  Both of them evaluated the weight of her equipment to substantiate this conclusion and found the equipment did not weigh more than fifty pounds.  Dr. Filzen likewise told Parker that in the event she felt uncomfortable lifting any equipment, despite its actual weight, that her co-consultant would be available to assist.  Additionally, Dr. Filzen confirmed that any accommodation Parker needed would be made available, though there had never been any request for such an accommodation.

¶58.   Parker asserts she earns less money post-injury, claiming that due to her pain, she cannot work a forty-hour week as she did pre-injury.  As noted, the Commission specifically took into account *and accepted* the factors Parker relied upon in claiming a 50% loss of wage-earning capacity, including her claim of continued pain that she asserted keeps her

---

[9] The second FCE Frame administered provides as follows:

The client exhibits the physical capability to perform medium work, with the exception lifting above waist levels.  Medium work is defined as: exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects.  Physical demand requirements are in excess of those for light work.

25

from maintaining a forty-hour work week. But as the Commission noted, Parker has no medical restriction on the number of hours she may work. Parker acknowledged at the evidentiary hearing that she was allowed to set her own schedule, and she chose to reduce her hours. There is no evidence that Parker experienced a lack of available work upon her return. Rather, the reduction in hours was Parker's decision, and she offered no evidence of any medical necessity to support this self-imposed limitation.

¶59. The Commission also found that based on Parker's education, training, and prior work experience as a dental hygienist, she maintains a high wage-earning capacity in the open labor market. Pennington testified that Parker could earn up to $69,000 per year as a dental hygienist in the private sector. That is over $27,000 more per year than Parker's pre-injury wages. Pennington also testified that the job of a dental hygienist in a clinical setting is considered a light-duty position, requiring lifting only twenty pounds on an occasional basis. Parker performed no job search and offered no evidence to rebut the testimony regarding her employment opportunities in the open labor market and potential earning capacity.

¶60. "Decisions as to loss of wage-earning capacity are largely factual and are to be left largely to the discretion and estimate of the Commission." *Kroger*, 327 So. 3d at 689 (¶16) (quoting *Neshoba Cnty. Gen. Hosp. v. Howell*, 999 So. 2d 1295, 1298 (¶8) (Miss. Ct. App. 2009)). Because substantial evidence supports the Commission's determination on the issue of Parker's loss of wage-earning capacity, we affirm this ruling as well.

¶61. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.**

**WESTBROOKS, J., DISSENTING:**

¶62. I respectfully dissent from the majority's affirmance of the Mississippi Workers' Compensation Commission's dismissal of Parker's right shoulder claim and reduction of Parker's loss of wage-earning capacity. Parker's shoulder injury is supported by objective medical evidence, and the Commission's determination that Parker only sustained a 15% loss of wage-earning capacity was arbitrary and capricious. Therefore, I would find in favor of Parker on both issues and remand the case to the Commission for a new calculation of Parker's loss of wage-earning capacity.

¶63. On July 6, 2017, Parker sustained an admitted injury during the course and scope of her employment while employed by the Mississippi Department of Health (MDH) as a regional oral consultant. According to Parker, she tripped over a missing tile in the floor and fell, injuring her right wrist, hip, back, and neck. She reported to the emergency room and was later treated by an assortment of doctors for these injuries. On November 27, 2017, during a functional capacity exam (FCE) ordered by her doctor, Parker alleged that she suffered an additional injury to her right shoulder. Parker states that a weighted box she was attempting to put on a head-level shelf fell down onto her right shoulder, which caused her immediate pain. Parker sought workers' compensation benefits for this injury in addition to the original wrist, back, and neck injuries. But MDH denied that the shoulder injury ever

27

occurred.

¶64. Doug Roll performed the initial FCE, which was originally scheduled for November 27-28, 2017. Roll did not recall Parker injuring her right shoulder during the first day of this FCE, but he testified that he had not completely reviewed the records before the deposition. Roll further admitted that he had no independent recollection of the specific FCE in question; he was relying on his notes for his deposition testimony. After a review of his notes, Roll testified that he saw no indication that Parker injured her right shoulder at the FCE or asked him to stop the evaluation due to pain. When asked if Parker told him she was in "some sort of pain" during the box lift, Roll responded that "she may have, yeah," but he did not recall her telling him that she was in pain. Roll testified that whether he made a note of a patient's pain complaints "depend[ed] on the level of complaints." He continued, stating "[b]ut typically with workers' comp[ensation] patients, they don't like doing [the FCE] because they know their claim is coming to an end." Roll then repeated that "pain [was] subjective" and not one of the "hard and fast data points" that he found more relevant to record in his notes.

¶65. Parker did not complete the second day of the FCE with Roll as scheduled. The FCE report, attached as an exhibit to Roll's deposition, noted that the "client did not attend day 2 of the functional capacities evaluation due to her reports of increased pain." A journal entry for November 28, 2017, which was also attached to Roll's deposition, noted that someone "[c]alled PT and she stated that she was to[o] sore to come to the appt, she cannot

28

move."

¶66. On January 9, 2018, approximately six weeks after the November 2017 FCE, Parker first reported her right shoulder injury to Dr. Graham, who was treating her for her back, leg, neck, and arm injuries. Dr. Graham's medical notes stated Parker "reports that she injured her shoulder removing a box from an overhead position. Because [of] the pain she states she was unable to complete the [second day of the] test." Dr. Graham sent Parker for a second FCE, which she successfully completed in March 2018.

¶67. On August 3, 2018, approximately eight months after the November 2017 FCE, Parker returned to Dr. Salloum with complaints of pain and an injury to her right shoulder. She reported the accident at the November 2017 FCE to Dr. Salloum. According to Dr. Salloum's notes, "[P]atient states she was doing . . . her functional capacity exam when she told [the] therapist she couldn't hold [a] box above her head, the box fell on her shoulder." Two months later, in October 2018, Dr. Salloum recommended surgery for Parker's right shoulder. Parker later testified that she would have liked to have had the shoulder surgery, but MDH did not approve it as covered under MDH's workers' compensation obligations.

¶68. Finally, on November 16, 2018, Dr. Mitias performed an employer's medical evaluation on behalf of MDH. In his evaluation, Dr. Mitias opined, "I do not believe that [Parker's right] shoulder complaints are causally related to lifting tasks. . . . I cannot find the correlation where she would have torn her rotator cuff doing the lifting." Dr. Mitias compared Parker's 2010 and 2018 MRIs, noting that both showed a partial tear of the

29

supraspinatus (in her right shoulder). His evaluation stated, "Her repeat MRI done recently shows that the tear simply extended and is still partial." He believed that the extended tear indicated a chronic condition. Dr. Mitias separately recommended surgery for Parker's right shoulder. But Dr. Mitias opined that the surgery should be covered by Parker's private insurance. While not explicitly prohibited, this final comment seems to go beyond Dr. Mitias' expert purview and invade the province of the Commission.

## I.     Right Shoulder Injury

¶69.    When making a determination on Parker's right-shoulder injury claim, the Commission correctly noted that a claim of disability "must be supported by medical findings." Miss. Code Ann. § 71-3-3(i) (Rev. 2011). And "[i]n all but the simple and routine cases[,] . . . it is necessary to establish medical causation by expert testimony." *Cole v. Superior Coach Corp.*, 234 Miss. 287, 291, 106 So. 2d 71, 72 (1958). But our Supreme Court has also held:

> The claimant is competent to prove his own claim, and his testimony may be accepted without corroboration. It may be acted upon although disputed by other witnesses and if undisputed and not untrustworthy, must be taken as conclusive proof of the fact. On the other hand, if the claimant is uncorroborated as to the occurrence of a claimed accident and is shown to have made statements inconsistent with the claim, the commission is not bound to accept the testimony as the basis for an award.

*Penrod Drilling Co. v. Etheridge*, 487 So. 2d 1330, 1333 (Miss. 1986) (quoting Vardaman S. Dunn, *Mississippi Workmen's Compensation* § 264 (3d ed. 1982)).

¶70.    In the present case, not only is there credible, consistent testimony from Parker, but

30

objective medical records and expert medical testimony support her claim as well. Dr. Mitias' medical evaluation, completed upon MDH's request, found that Parker had an extended tear from a previously documented partial rotator cuff tear. Dr. Mitias also recommended surgery, a recommendation that was not given after Parker's 2010 MRI. Surgery was only recommended after Parker reported a 2018 shoulder injury. Dr. Salloum, who treated Parker in both 2010 and 2018 (after the 2017 FCE with Roll) also saw a need for surgery in 2018 after Parker reported the shoulder injury. Again, it was undisputed that before the accident, Parker was not receiving medical treatment for her shoulder and required no work accommodations for her shoulder. She was performing all her employment tasks without any reported issues. It was only after her reported injury at the FCE that two medical professionals recommended shoulder surgery.

¶71. The Commission also pointed to the testimony of Roll to support its finding that there was no compensable injury to Parker's right shoulder. But Roll's testimony fails to contradict Parker's claim. Roll repeatedly testified that he had no memory of the FCE. When asked if he recalled the incident of the box falling on Parker's shoulder and the conversation regarding her pain that Parker said transpired between them, Roll stated, "I do so many FCEs that that conversation may have occurred, but I can refer to my record." He consistently repeated that he had no recollection of the FCE. Roll's records corroborate that Parker reported she was in too much pain on the second day to return to the FCE. His notes confirm that Parker did not attend the second day of the FCE "due to her reports of increased

31

pain" and "that she was to[o] sore to come to the appt, she cannot move."

¶72. Additionally, the Commission relied on Dr. Mitias' opinion to determine there was no compensable shoulder injury. This opinion also fails to contradict Parker's claim. Although Dr. Mitias stated, "I cannot find the correlation where she would have torn her rotator cuff doing the lifting[,]" he omitted any opinion as to whether the box's *falling* on Parker could have caused the injury. Parker never stated that she injured her shoulder during the lifting portion of her FCE. She specifically and repeatedly reported that the box *fell* on her shoulder while she was lifting it, and that caused the shoulder pain. Dr. Mitias never addressed this scenario.

¶73. Parker's testimony about her right shoulder injury during the FCE was found by the AJ to be trustworthy and credible. The Commission never found her testimony to be otherwise. Her testimony was supported by an objective medical test (an MRI) performed by MDH's own doctor, which showed an extension of a previous injury. Her testimony was corroborated by reports and additional medical records. In the end, "medical opinions do not have to be precise, complete, or unequivocal." *Mueller Copper Tube Co. v. Upton*, 930 So. 2d 428, 437 (¶38) (Miss. Ct. App. 2005) (citing *Siemens Energy & Automation Inc. v. Pickens*, 732 So. 2d 276, 286 (¶40) (Miss. Ct. App. 1999)). Here, an aggravation of a pre-existing injury is well documented by both Parker and MDH, as well as a new need for surgery after the November 2017 FCE.

¶74. "Where medical expert testimony is concerned, this Court has held that whenever the

32

expert evidence is conflicting, the Court will affirm the Commission whether the award is for or against the claimant." *Washington v. Woodland Vill. Nursing Home*, 25 So. 3d 341, 355 (¶33) (Miss. Ct. App. 2009) (quoting *Raytheon Aero. Support Servs. v. Miller*, 861 So. 2d 330, 336 (¶13) (Miss. 2003)). But "a finding is clearly erroneous when, although there is some slight evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made by the [C]ommission in its findings of fact and in its application of the act." *Id.* (quoting *Cent. Elec. Power Ass'n v. Hicks*, 236 Miss. 378, 390, 110 So. 2d 351, 356 (1959)). In the present case, it cannot be said that the evidence is conflicting. The medical evidence and testimony in the record either support Parker's version of events or fail to address it at all.

¶75. "Substantial evidence . . . means something more than a 'mere scintilla' of evidence." *Delta CMI v. Speck*, 586 So. 2d 768, 773 (Miss. 1991). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' and affords 'a substantial basis of fact from which the fact in issue can be reasonably inferred.'" *Univ. of Miss. Med. Ctr. v. Smith*, 909 So. 2d 1209, 1218 (¶29) (Miss. Ct. App. 2005) (quoting *Cent. Elec. Power Ass'n*, 236 Miss. at 389, 110 So. 2d at 357). In the present case, substantial evidence overwhelmingly supports Parker's version of events. The holding of the Commission otherwise is clearly erroneous and is contrary to the overwhelming weight of the evidence. A determination "unsupported by substantial evidence is necessarily arbitrary and capricious." *Gregg v. Natchez Trace Elec. Power Ass'n*, 64 So. 3d 473, 475

(¶8) (Miss. 2011). Because I find that substantial evidence does not support the Commission's determination in this matter, I would reverse the Commission's determination on the right shoulder injury,

## II. Loss of Wage-Earning Capacity

¶76. In its May 26, 2022 order, the Commission found that Parker successfully rebutted the presumption that she suffered no loss of wage-earning capacity, affirming the AJ's analysis. The AJ's comparison of pre- and post-injury weekly wage records showed that Parker earned approximately half of the weekly income that she earned before her injuries due to her reduction in working hours. The AJ also found that the medical evidence of back injury, continuing pain, and the continuing need for medical treatment and accommodations from her employer, along with Parker's credible testimony, was sufficient to rebut the presumption that she suffered no loss of wage-earning capacity. The AJ also noted that "there was no way to assume that [Parker] can or should work her pre-injury hours."

¶77. Even though the Commission affirmed these findings, it reduced Parker's loss of wage-earning capacity from 50% to 15%. In its opinion, the Commission noted as relevant the permanent medical impairment ratings of 7% to her lumbar spine and 19% to her cervical spine, Parker's authority to set her own work schedule, her lack of medical opinion to restrict the number of hours per week due to her injury, her ability to work more hours, her ability to earn wages in the open labor market, her subjective complaints of ongoing pain, and her unchanged hourly wage. The Commission then found that "based on the evidence as a

34

whole," her loss of wage-earning capacity was 15%. Unlike the AJ, Commission pointed to no metric or data to explain how it reached the 15% figure.

¶78. In *Howard Industries Inc. v. Robinson*, 846 So. 2d 245 (Miss. Ct. App. 2002), the Commission found that the claimant's permanent impairment resulted in a loss of $75 per week in wage-earning capacity without any apparent basis in the evidence for that figure. *Id.* at 256 (¶33). This Court noted that "no mathematical calculations appear. The Commission adopted the conclusion without making any reference to specific wages before or after the injury." *Id.* In *Howard*, this Court remanded the case to the Commission, stating:

> On this state of the record, we are at a loss of whether there was any significant effort to determine a figure, or whether $75 was just adopted as a relatively low amount that represented some loss of capacity to earn wages. We find the reason for this amount to be sufficiently indecipherable that we remand to the Commission to explain in further fact-findings, or to adopt some other figure that on further review better represents the evidence.

*Id.* at 257 (¶38). The same reasoning applies to the present case.

¶79. "Loss of wage earning capacity is no abstract notion but one to be measured by the flesh and blood realities of the life circumstances of a particular worker." *Stuart's Inc. v. Brown*, 543 So. 2d 649, 652 (Miss. 1989) (citing *Pontotoc Wire Prods. Co. v. Ferguson*, 384 So. 2d 601, 603 (Miss. 1980)). This means that "[t]he Commission is not confined to medical testimony in determining the percentage of loss to be assigned to an injury." *McGowan v. Orleans Furniture Inc.*, 586 So. 2d 163, 167 (Miss. 1991). "Lay testimony may be considered to supplement medical testimony." *Id.* Even though lay testimony may be considered, "'[t]he probative value of any witness' testimony is for the fact-finder to

35

determine.'" *Id.* (quoting *R.C. Petroleum Inc. v. Hernandez*, 555 So. 2d 1017, 1021 (Miss. 1990)). But "the determination should be made only after considering the evidence as a whole." *Id.* (citing *Piggly Wiggly v. Houston*, 464 So. 2d 510, 512 (Miss. 1985)).

¶80. Parker's undisputed testimony is that she cannot work her previous hours due to the stipulated injuries to her back and wrist, permanent assessments of her spine, and continued medical treatment on her back. Medical evidence and wage records support this testimony. The Commission has given no calculation for its reduction of Parker's loss of wage-earning capacity from 50% to 15%. There is no explanation of this figure in the record. The number could very well have been plucked from the sky. For these reasons, I find this figure to be arbitrary and capricious and unsupported by substantial evidence. Accordingly, I would reverse and remand to the Commission for a proper determination of the total loss of wage-earning capacity Parker suffered.

¶81. The majority determines that there is substantial evidence to support the Commission's rulings on both the lack of compensability for Parker's right shoulder and the reduction in Parker's loss of wage-earning capacity. Because I disagree with the majority's determination, I respectfully dissent.

**McDONALD, J., JOINS THIS OPINION.**